28 F.3d 1146
 92 Ed. Law Rep. 1124
 Albert E. LASSITER, Plaintiff-Appellant,
v.
ALABAMA A & M UNIVERSITY, BOARD OF TRUSTEES; Douglas
Covington; Thomas Fuller; Herbert Gray; Robert
T. Hughes; W. Troy Massey; Eddie
Player, Defendants-Appellees.
 No. 92-6295.
 United States Court of Appeals, Eleventh Circuit.
 Aug. 17, 1994.
 
 Susan Williams Reeves, Birmingham, AL, David Blankenship, Huntsville, AL, for appellant.
 Gerald R. Weber, Jr., ACLU of Georgia, Atlanta, GA, for amicus curiae--ACLU of Georgia.
 Joe R. Whatley, Jr., Sam Heldman, Cooper, Mitch, Crawford, Kuykendall & Whatley, John C. Falkenberry, Birmingham, AL, for appellees.
 Michael J. Bowers, Carol A. Cosgrove, Office of Atty. Gen., Atlanta, GA, for amicus curiae--State of Ga.
 J. Lewis Sapp, Stanford G. Wilson, R. Read Gignilliat, William D. Deveney, Walter O. Lambeth, Jr., Atlanta, GA, for amicus curiae--Association County Commissioners of Ga., and Ga. Municipal Assn.
 Neal D. Bowen, Office of Atty. Gen., Kissimee, FL, for amicus curiae--Osceola County, Fla.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before TJOFLAT, Chief Judge, KRAVITCH, HATCHETT, ANDERSON, EDMONDSON, COX, BIRCH, DUBINA, BLACK, CARNES and BARKETT, Circuit Judges.
 EDMONDSON, Circuit Judge:
 
 
 1
 Principles of qualified immunity govern this case. The controversy arises from the discharge, without a hearing, of plaintiff from state employment. In the district court, defendants, in their individual capacities, were granted judgment as a matter of law under Fed.R.Civ.Pro. 50(a). We affirm the judgments.
 
 THE CASE
 
 2
 In June 1986, defendants--state university officials--were deciding what steps to take to discharge Albert Lassiter from his employment with Alabama A & M University (the "University"). Lassiter asked for a hearing. But defendants fired Lassiter without offering him a hearing.
 
 
 3
 Lassiter was entitled under the Federal Constitution to no procedural due process unless, under state law, he had a legitimate expectation of continued employment which rose to the level of a property right. Whitfield v. Finn, 731 F.2d 1506, 1507-08 (11th Cir.1984) (citing Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)). Two documents have been advanced by Lassiter as possible sources of such a property right: his employment contract and a University policy manual. No one disputes the wording of these documents. The parties do disagree on the significance and meaning of the documents. A copy of the contract and pertinent manual excerpts are appended to this opinion.
 
 
 4
 Lassiter sued defendants in their individual capacities (and otherwise) under several theories. At trial, the district court, among other things, granted defendants judgment on the grounds of qualified immunity.[1] The issue in this case is whether defendants were due qualified immunity on Lassiter's claim that his termination deprived him of a property right without due process of law.
 
 QUALIFIED IMMUNITY PRINCIPLES
 
 5
 No new rules need to be announced to decide this case. But, for emphasis, we restate principles which do govern qualified immunity cases:
 
 
 6
 I. Qualified immunity protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability if their conduct violates no "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); Siegert v. Gilley, 500 U.S. 226, 231-33, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991) (no discovery if immunity question can end case); see also Hunter v. Bryant, 502 U.S. 224, ----, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991) ("we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation") (citations omitted). The qualified immunity doctrine means that government agents are not always required to err on the side of caution. Davis v. Scherer, 468 U.S. 183, 196, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984).
 
 
 7
 II. That qualified immunity protects government actors is the usual rule; only in exceptional cases will government actors have no shield against claims made against them in their individual capacities.[2] Harlow, 457 U.S. at 818, 102 S.Ct. at 2738 (officials "generally are shielded from liability for civil damages"); Barts v. Joyner, 865 F.2d 1187, 1190 (11th Cir.1989) ("The Harlow decision sets up a bright-line test that is a powerful constraint on causes of action under section 1983."); Dartland v. Metropolitan Dade County, 866 F.2d 1321, 1323-24 (11th Cir.1989) (when "no bright-line standard puts the reasonable public employer on notice of a constitutional violation, the employer is entitled to immunity except in the extraordinary case where [First Amendment case law] would lead to the inevitable conclusion that the [act taken against] the employee was unlawful"). Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit. See Malley v. Briggs, 475 U.S. 335, 341-43, 106 S.Ct. 1092, 1096-97, 89 L.Ed.2d 271 (1986). Because qualified immunity shields government actors in all but exceptional cases, courts should think long and hard before stripping defendants of immunity.
 
 
 8
 III. For the law to be clearly established to the point that qualified immunity does not apply, the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that "what he is doing" violates federal law. Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Qualified immunity is a doctrine that focuses on the actual, on the specific, on the details of concrete cases.
 
 
 9
 The most common error we encounter, as a reviewing court, occurs on this point: courts must not permit plaintiffs to discharge their burden[3] by referring to general rules and to the violation of abstract "rights." See Anderson, 483 U.S. at 639-41, 107 S.Ct. at 3038-39 (even though the "general right [defendant] was alleged to have violated--the right to be free from warrantless searches of one's home unless the searching officers have probable cause and there are exigent circumstances--was clearly established," lower court should have "consider[ed] the argument that it was not clearly established that the circumstances with which [defendant] was confronted did not constitute probable cause and exigent circumstances") (emphasis added); see also Barts, 865 F.2d at 1190 (stating "clearly established" question at specific, factually defined, level).
 
 
 10
 "General propositions have little to do with the concept of qualified immunity." Muhammad v. Wainwright, 839 F.2d 1422, 1424 (11th Cir.1987). "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." Post v. City of Fort Lauderdale, 7 F.3d 1552, 1557 (11th Cir.1993), modified, 14 F.3d 583 (11th Cir.1994); accord Kelly v. Curtis, 21 F.3d 1544, 1554 (11th Cir.1994).[4] "The line is not to be found in abstractions--to act reasonably, to act with probable cause, and so forth--but in studying how these abstractions have been applied in concrete circumstances." Barts, 865 F.2d at 1194. And, as the en banc court recently accepted:
 
 
 11
 When considering whether the law applicable to certain facts is clearly established, the facts of cases relied upon as precedent are important. The facts need not be the same as the facts of the immediate case. But they do need to be materially similar. See, e.g., Edwards v. Gilbert, 867 F.2d 1271, 1277 (11th Cir.1989). Public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases.
 
 
 12
 Adams v. St. Lucie County Sheriff's Dept., 962 F.2d, 1563, 1573, 1575 (11th Cir.1992), (Edmondson, J., dissenting) (emphasis added), approved en banc, 998 F.2d 923 (11th Cir.1993). For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances.
 
 
 13
 IV. Because qualified immunity is a doctrine of practical application to real-life situations, courts judge the acts of defendant government officials against the law and facts at the time defendants acted, not by hindsight, based on later events. See Hunter, 502 U.S. at ----, 112 S.Ct. at 537 ("the court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be construed five years after the fact").
 
 
 14
 V. The subjective intent of government actor defendants plays no part in qualified immunity analysis. Anderson, 483 U.S. at 641, 107 S.Ct. at 3040 (despite that courts may inquire into "information possessed" by defendant, the defendant's "subjective beliefs ... are irrelevant"); Mitchell v. Forsyth, 472 U.S. 511, 517, 105 S.Ct. 2806, 2810, 86 L.Ed.2d 411 (1985) (in Harlow, "this Court purged qualified immunity doctrine of its subjective components"); Hansen v. Soldenwagner, 19 F.3d 573, 578 (11th Cir.1994) ("[t]he Supreme Court in Harlow staked a new path for immunity law by abandoning the subjective element of 'good faith' immunity in favor of an objective test"). Objective legal reasonableness is the touchstone.
 
 
 15
 VI. A decision on qualified immunity is separate and distinct from the merits of the case--a principle illustrated by the Supreme Court's willingness to treat the denial of qualified immunity at summary judgment as an appealable collateral order. Mitchell, 472 U.S. at 527-29, 105 S.Ct. at 2816-17 ("it follows from the recognition that qualified immunity is in part an entitlement not to be forced to litigate the consequences of official conduct that a claim of immunity is conceptually distinct from the merits of the plaintiff's claim that his rights have been violated"); Green v. Brantley, 941 F.2d 1146, 1151-52 (11th Cir.1991) (en banc) ("whether the defendant official is entitled to qualified immunity on a particular damage claim is also conceptually distinct from the substantive merits" for purposes of collateral review doctrine). Immunity contemplates exemption from liability that would otherwise exist on the merits.
 
 APPLICATION OF PRINCIPLES
 
 16
 In June 1986, defendants faced a decision: would they grant plaintiff a hearing before deciding finally to dismiss him? The law was clearly established at the time that, if Lassiter had a legitimate expectation of continued employment, he was due the hearing. But this general proposition is, in reality, a useless bit of abstract information, giving no practical instruction to defendants at the time and, in turn, having almost nothing to do with whether qualified immunity would protect defendants' acts. See Anderson, 483 U.S. at 639-41, 107 S.Ct. at 3038-39; see also Barts, 865 F.2d at 1190 (plaintiffs may not rely on "general, conclusory allegations of some constitutional violation, [n]or [may they rely on] broad legal truisms").
 
 
 17
 No one disputes what defendants in this case did: they fired Lassiter without a hearing, in the face of a contract and policy manual--the words of which are undisputed. The historical or operative facts to which we apply the principles of qualified immunity were set on the date Lassiter was dismissed. Because in June 1986, when defendants acted, it was not clearly established as a matter of law in Alabama that either the contract's words[5] or the manual's words[6] or both would support a property right for Lassiter, the law was also not clearly established that Lassiter was, when defendants acted, due a hearing.[7]
 
 
 18
 The line between lawful conduct and unlawful conduct is often vague and thin. The essence of qualified immunity is that it is unfair--and, as a matter of public policy, unwise--to impose personal liability on government officers unless the officers had advance notice that what they were doing was unlawful. Pre-existing law must supply this notice; the unlawfulness must be obvious, considering the circumstances confronting the officers. No one--no matter how learned in the law--could have known in 1986 whether Lassiter was due, under federal law, a hearing or not.[8] So, defendants are entitled to qualified immunity.
 
 
 19
 AFFIRMED in part, REVERSED in part, and REMANDED.[9]
 
 
 20
 APPENDIX A
 ALABAMA AGRICULTURAL AND MECHANICAL UNIVERSITY
 NORMAL, ALABAMA 35762
 OFFICIAL ANNOUNCEMENT OF APPOINTMENT AND CONTRACT
TO: Mr. Albert E. Lassiter
 Vice President for Business and Finance
 The President of the University is appointing you as designated above, subject
 to approval of the University Board of Trustees, and governed by policies,
 procedures, regulations and standards recorded in official University
 policies and procedures publications, for the period from May 1 , 19 85 to
 *September 30 , 19 85 , or for such portion of the period as your services
 are found satisfactory, and as the finances of the University permit at an
 annual salary of $ 51,000.00 , payable in 12 monthly payments, effective June
 1 , 19 85
 If this is a part-time instructional appointment, it is contingent upon a per
 class enrollment of at least _______ students, and will be consummated with
 the President's signature when the class(es) make(s).
 If you accept the appointment, sign all four copies of this notice and
 contract between you and the University. Return all four copies (within 10
 days). Your copy will be returned to you when the President has signed.
 If you will not accept the appointment, please note the fact on all forms and
 return them immediately to the
 For Alabama A. & M. University
 April 18, 1985 By: (s) Douglas Covington
----------------------------------- ----------------------------
 (Date of Announcement) (President)
BUDGET OR SOURCE OF FUNDS: ____________________________________________________
 _____________________________________________________________________________
* This appointment and contract, which commence on May 15, 1985 and extend
 through September 30, 1985 (the end of the current fiscal year), would be
 extended, through our mutual agreement, on October 1, 1985.
-------------------------------------------------------------------------------
The President
Alabama A. & M. University
 I hereby accept the above stipulated appointment and will assume my duties on
 the date the appointment becomes effective.
 I promise to give sixty days' notice if I seek release from this agreement.
 April 25, 1985 Signed (s)
 Albert E.
 Lassiter
----------------------------------- -----------------------
 (Date of Acceptance)
 
 
 21
 APPENDIX B*
 
 ANDERSON, Circuit Judge, concurring:
 
 22
 For purposes of qualified immunity, the relevant facts are the facts known to the decision-maker. In this case, Lassiter has pointed to no genuine issue of material fact as to what the decision-maker knew.[1] In my judgment, the decision-maker did not know facts which clearly indicated that the contract had been extended by mutual agreement. Thus, the decision-maker did not know facts which clearly indicated that Lassiter had a property interest. Accordingly, I concur in and join the opinion by Judge Edmondson for the court.
 
 BARKETT, Circuit Judge, concurring:
 
 23
 I concur in the result only.
 
 
 24
 KRAVITCH, Circuit Judge, concurring in part and dissenting in part in which HATCHETT, Circuit Judge, joins:
 
 
 25
 I agree with the majority opinion insofar as it concludes that the district court did not err in granting the defendants qualified immunity on the issue of whether the personnel policy manual created a property interest. I do not agree, however, with the majority's resolution of the due process claim based upon a property interest created by the contract. Therefore, I respectfully dissent on that issue.
 
 
 26
 The contract between Lassiter and the university has been determined as a matter of law to be ambiguous on the issue of its duration. Lassiter v. Covington, 861 F.2d 680, 683 (11th Cir.1988) (Lassiter I ). The majority opinion contends that this means that, "[b]y definition, then, a reasonable university official could not know whether firing Lassiter, without a hearing, under these circumstances violated the due process clause. Put differently, the landscape of pre-existing law would have compelled no definite conclusion from reasonable persons in defendants' positions, given the ambiguous contract before them." In my view, this analysis obscures the issue of when qualified immunity is appropriate and reflects a misunderstanding of the significance of the legal conclusion that a contract is ambiguous.
 
 
 27
 Established law in this circuit has recognized that where the legal norms at issue are clearly established, critical factual disputes preclude the grant of qualified immunity. See Swint v. City of Wadley, Ala., 5 F.3d 1435, 1442 (11th Cir.1993), modified on other grounds, 11 F.3d 1030 (11th Cir.1994); Rich v. Dollar, 841 F.2d 1558, 1564-65 (11th Cir.1988). The majority opinion violates this rule by affirming a grant of qualified immunity despite a factual dispute on the critical issue in this case. The Lassiter II panel noted:
 
 
 28
 Qualified immunity turns on ambiguity in the law, not ambiguity in the contract. If the law is clear, but there are issues of fact concerning the contract, then a defendant is not immune from having a jury resolve the factual issues concerning the contract.
 
 
 29
 In 1986, the law was clear that an employee with a contractual expectation of continued employment had a property interest in that employment. Board of Regents v. Roth, 408 U.S. 564, 577-78, 92 S.Ct. 2701, 2709-10, 33 L.Ed.2d 548 (1972).
 
 
 30
 3 F.3d 1482, 1486 (11th Cir.1993), vacated, reh'g en banc granted, 19 F.3d 1370 (11th Cir.1994).
 
 
 31
 The determination that the contract in this case is ambiguous is not tantamount to a conclusion that a reasonable university official, possessing the information known to the defendants, would have thought that Lassiter was not under contract on the date that he was fired. Rather, it is simply a finding that the normal methods of interpreting a contract are inadequate. In an unambiguous contract the words of the agreement alone control its interpretation. In such cases, contractual rights are interpreted by the court based on written words of the agreement. Parol evidence usually is inadmissable. In an ambiguous contract, however, the words alone cannot solely determine the substance of the actual agreement between the parties. See Miles College, Inc. v. Oliver, 382 So.2d 510, 511 (Ala.1980). Alabama law clearly provides that once a contract has been found, as a matter of law, to be ambiguous on its face, the meaning of the contract becomes a question of fact to be determined by the jury. McDonald v. U.S. Die Casting and Dev. Co., 585 So.2d 853, 855 (Ala.1991). Alabama law dictates that,
 
 
 32
 [s]hould the trial court determine a contract to be ambiguous, yet not void for uncertainty, the question of the true meaning of the contract becomes an issue for the jury to decide. To aid the jury in this determination, evidence of facts and circumstances aliunde (from another source) or in pais (outside the record of the contract) may be introduced to aid the jury in its clarification of the terms of the contract; it then becomes the province of the jury to draw inferences and ascertain those facts from which the true meaning of the contract's terms can be determined.
 
 
 33
 Miles, 382 So.2d at 511 (citations omitted) quoted in Middleton v. Dan River, Inc., 834 F.2d 903, 911 (11th Cir.1987). A ruling that a contract is ambiguous does not mean that the parties did not have an agreed upon understanding of the contract terms, or that they failed to reach an agreement on the issue left ambiguous in the contract. It merely means that extrinsic evidence must be consulted to adequately identify the rights conferred upon the parties by the contract. Thus, it does not follow that because the contract is ambiguous a reasonable university official in the appellees' position could have concluded that there was no contract that extended past September 1985.
 
 
 34
 Crucial to the resolution of this claim is a determination of the dates of the contract.[1] The text of the contract itself does not answer this question.[2] The facts and circumstances surrounding the formation of the contract showed that prior to working for the university, Lassiter was employed by the state of Mississippi as the director of Public Accounts. Lassiter was recruited by the university to leave that job and accept a position as vice president for Business and Finance at Alabama A & M. Lassiter presented evidence that during contract negotiations he was told that the university could not commit to a contract that extended beyond the fiscal year, which ended on September 30. He testified, however, that Dr. Covington, the president of the university, advised him that the contract would be automatically renewed in October 1985 and would run through September 1986. Dr. Covington testified that he and Lassiter had agreed only to a five month contract, from May until September, and that the extension referred to in the contract was to occur through their mutual agreement at a later point. Dr. Covington further testified that no such agreement to extend the contract was ever reached and therefore Lassiter worked for the university without a contract after September 1985. Because the resolution of this factual issue was critical to the determination of Lassiter's claim, the trial court erred in not sending the factual question of the duration of the contract to the jury.
 
 
 35
 I therefore would reverse the district court's grant of qualified immunity on the due process claim grounded in the contract and remand for a jury resolution of the factual dispute.
 
 
 
 [1]
 For additional facts about this case, see Lassiter v. Covington, 861 F.2d 680 (11th Cir.1988) (Lassiter I ), and Lassiter v. Alabama A & M Univ., 3 F.3d 1482 (11th Cir.1993) (Lassiter II ), vacated, reh'g, en banc, granted, 19 F.3d 1370 (11th Cir.1994)
 
 
 [2]
 While qualified immunity almost always applies in damage claims against government actors in their individual capacities, the defense is a narrow one, leaving plaintiffs other avenues of relief. Plaintiffs remain free (subject to Eleventh Amendment constraints) to seek money damages against government actors in their official capacity. Plaintiffs may also seek injunctive relief
 
 
 [3]
 Once the qualified immunity defense is raised, plaintiffs bear the burden of showing that the federal "rights" allegedly violated were "clearly established." Barts, 865 F.2d at 1190 (citing Mitchell v. Forsyth, 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985))
 
 
 [4]
 We leave open the possibility that occasionally the words of a federal statute or federal constitutional provision will be specific enough to establish the law applicable to particular circumstances clearly and to overcome qualified immunity even in the absence of case law
 
 
 [5]
 The contract has been ruled ambiguous as a matter of law by the Lassiter I panel, 861 F.2d at 683. We agree. "An ambiguity exists where a term is reasonably subject to more than one interpretation." Cannon v. State Farm Mut. Auto. Ins. Co., 590 So.2d 191, 194 (Ala.1991). By definition, then, a reasonable university official could not know whether firing Lassiter, without a hearing, under these circumstances violated the due process clause. Put differently, the landscape of pre-existing law would have compelled no definite conclusion from reasonable persons in defendants' positions, given the ambiguous contract before them
 
 
 [6]
 Defendants correctly argue that it was in no way established--much less clearly so--that in June 1986 a policy manual or employee handbook featuring language contained in the University's manual would alter Alabama's at-will presumption (for example, the manual did not expressly establish a for-cause termination standard). The implied-contract-from-personnel-manual theory on which Lassiter relies was not validated until the decision in Hoffman-La Roche, Inc. v. Campbell, 512 So.2d 725 (Ala.1987), which held, in 1987 (that is, after Lassiter had been fired), that "language contained in a handbook can be sufficient to constitute an offer to create a binding unilateral contract," depending on how specific the language is. Id. at 735 (emphasis added). When defendants acted, reasonable people in defendants' positions could not have known that the particular language used in the University Manual (or any manual, for that matter), gave Lassiter an expectation of continued employment. See id., at 740-52 (Maddox, J., dissenting) (arguing that majority overruled two earlier decisions which refused to find that employment manuals altered at-will presumption)
 Nor does Lassiter's citation to Belcher v. Jefferson County Bd. of Educ., 474 So.2d 1063 (Ala.1985), indicate that Alabama law "clearly established" that the manual provided him with a continued expectation of employment. For example, Belcher involved a high school teacher who was fired in contravention of a county board of education "teacher evaluation policy." Belcher could not "clearly establish" Lassiter's alleged due process rights in this case because Belcher--involving a county school board whose powers and duties are controlled by statutes different from those controlling University officers--dealt with facts and circumstances that were not "materially similar" to the facts and circumstances facing defendants. See Adams, 962 F.2d at 1575. So, the Belcher decision--regardless of what cases were cited in the court's opinion--could never dictate that the manual in this case gave Lassiter, a University officer, the necessary expectation of employment.
 
 
 [7]
 In addition, the record reveals no extrinsic facts about the formation of the contract which, if known by reasonable persons in defendants' positions in June 1986, would have resolved the ambiguities about the duration of Lassiter's contract. Even if one credits Lassiter's trial testimony, including his understanding and his intent for the contract, Alabama law in 1986 was not clearly established that the import of such evidentiary facts would be to oblige a judge to conclude as a matter of law that the contract's words had the legal effect that Lassiter advanced
 Alabama's law of contract construction has a strong objective element, see Lilley v. Gonzales, 417 So.2d 161, 163 (Ala.1982) ("the law of contracts is premised upon an objective rather than a subjective manifestation of intent"); thus, the parties' testimony about intent might not clearly control the case's outcome. See, e.g., Sealing Equip. Prod. Co. v. Velarde, --- So.2d ---- (Ala.1994) (must look at all circumstances surrounding formation of contract) (quoting Alabama Pattern Jury Instructions), accord, Russellville Flower Craft, Inc. v. Searcy, 452 So.2d 478 (Ala.1984). And, more than one inference about the contract's duration can be drawn from plaintiff's evidence in this case. Cf. Hall v. Integon Life Ins. Co., 454 So.2d 1338, 1342 (Ala.1984) (judgment by judge inappropriate when more than one interpretation of ambiguous contract may be drawn from facts).
 Therefore, reasonable university officers, even if fully informed in June 1986 of Lassiter's intent and understandings of the pertinent contract and the rest of plaintiff's trial evidence on the circumstances surrounding the making of the contract, would not have known in June 1986 whether Lassiter had the kind of property right that would demand due process protection. In other words, in June 1986 the duration of the contract (that is, the legal effect of the words used) was unknown and unknowable.
 
 
 [8]
 Even if some legal expert would have then concluded that a hearing was required, defendants would still be due qualified immunity if reasonable university officials would not have known about it. Davis, 468 U.S. at 196 n. 13, 104 S.Ct. at 3020 n. 13 ("unfair and impracticable" to hold public officials to the same level of knowledge as trained lawyers); Barts, 865 F.2d at 1193 ("[w]e cannot realistically expect that reasonable police officers know more than reasonable judges about the law"); Adams, 962 F.2d at 1575 n. 4, 1576 (same)
 
 
 [9]
 This opinion discusses only defendants' qualified immunity on Lassiter's procedural due process claims. On all other issues in this appeal, we adopt the conclusions reached by the panel in Lassiter II, 3 F.3d 1482
 
 
 *
 Appendix B includes pertinent sections of Plaintiff's Exhibit 9, taken from the University's policy manual. Policy No. IV:01:21 ("Separation and Notice"), appears in the order provided in plaintiff's exhibit. We believe, however, that this section was intended to be paginated--and can only be understood--in the following order: 1, 9, 8, 7, 6, 5, 3, 2, 4
 [Page 1 of 3]
ALABAMA A & M UNIVERSITY
 POLICY MANUAL
POLICY NO.: IV:01:06 DATE: OCT 1 1980
SUPERSEDES POLICY NO.: __________ DATED: _____________
SUBJECT: Grievances and Complaints
APPROVED: Dr. R.D. Morrison, President (s) R.D. Morrison
 Alabama A & M University provides all its employees an opportunity to seek
 redress of Grievances and Complaints through either an informal or formal
 procedure. The Director of Personnel can assist any employee encountering
 difficulty.
 Definition
Grievance(s): Redress sought by an employee where the matter(s) does
 not relate to race, sex, national origin, religion or
 handicap, or
Complaint(s): Redress sought by an employee(s) that relates to sex,
 race, national origin, religion or handicap.
 [Page 2 of 3]
 Grievance Procedure
 Whenever a group of people are required to work together for an extended
 period of time, misunderstandings as to application of University Policy will
 most certainly occur. In order to insure prompt and constructive handling of
 grievances, employees are requested to follow this procedure. Step One is the
 Informal Process.
 1. Within three (3) working days of the misunderstanding, consult with your
 supervisor concerning the matter. This will often lead to a
 satisfactory solution. If mutual agreement does not occur, you have
 five (5) working days to proceed with the second step of the grievance
 procedure.
Step Two.
 2. Within five (5) working days of your supervisor's answer, put your
 grievance in writing and send it to the Office of Personnel. Describe
 the problem, say what you wish to have done, and keep a copy of it.
 After receiving your written grievance, Personnel will arrange for a
 meeting of the interested parties within seven (7) to ten (10) working
 days. Within seven (7) working days after this, the person to whom
 your immediate supervisor reports will give you a written answer to
 your grievance. If mutual agreement does not occur at this time, you
 will then have five (5) working days to notify Personnel that you are
 initiating the third step of the grievance procedure.
 3. Your final appeal must again be in writing, again stating your grievance
 and listing the findings of Steps (1) and (2).
 [Page 3 of 3]
 This appeal should be forwarded to the Director of Personnel. After a
 review for procedural due process and policy compliance, arrangements
 will then be made to set up a Grievance Review Committee within seven
 calendar days after the appeal is received. This committee will be
 appointed by the President. You have the option of challenging one of
 the persons on the Grievance Review Committee without giving any
 reason. Your supervisor will have the same right. The Committee will
 be provided with all available information on the case and will hold a
 hearing within five (5) working days. A representative of Personnel
 will be present to assist and advise but will have no voice in the
 committee's ruling. You may have a fellow employee with you at this
 hearing. This is strictly an administrative proceeding and legal
 counsel is not permitted. The committee will make a written
 recommendation to the President's Office within seven (7) working days
 after reviewing the grievance. Within seven (7) working days of
 receipt of the Committee's recommendations you will receive a final
 decision from the President's Office.
COMPLAINTS
 Complaints shall be classified as redress sought by an employee that relates
 to sex, race, national origin or handicap. Every effort should be made to
 resolve the complaint at the lowest possible level and if resolution cannot
 be reached, the procedure enumerated in the grievance procedure should be
 followed as outlined for Faculty, Staff and Students in the University's
 Grievance and Complaint Procedure.
 [Page 1 of 1]
 ALABAMA A & M UNIVERSITY
 POLICY MANUAL
POLICY NO.: IV:01:15 DATE: OCT 1 1980
SUPERSEDES POLICY NO.: __________ DATED: ________________
SUBJECT: Types of Employment
APPROVED: Dr. R.D. Morrison, President (s) R.D. Morrison
 DEFINITIONS
FULL-TIME POSITION: A position requiring work through a normal forty (40) hour
 work week.
PART-TIME POSITION: A position requiring work on a fixed or flexible schedule
 of less than 40 hours per week. An employee in a part-time position is paid
 according to the number of hours worked, unless otherwise stipulated,
 part-time appointments are considered to be temporary.
PERMANENT POSITION: An authorized full-time or part-time position deemed as
 necessary on a continuing and scheduled basis.
TEMPORARY POSITION: A full-time or part-time position authorized for a maximum
 of six months. Where a person is employed to complete a task in an
 unspecified time frame. Persons being employed under this classification are
 employed in such instances as illness or injury of an employee or where a
 position was deserted and a replacement is needed immediately.
 [Page 1 of 9]
 ALABAMA A & M UNIVERSITY
 POLICY MANUAL
POLICY NO.: IV:01:21 DATE: OCT 1 1980
SUPERSEDES POLICY NO.: __________ DATED: _______________
SUBJECT: Separation and Notice
APPROVED: Dr. R.D. Morrison, President (s) R.D. Morrison
 Alabama A & M University provides its employees full protection and benefits
 of the various laws and regulations governing the termination of employment.
 It acts responsibilty to ensure that both individual and University interests
 are fully safeguarded.
 DEFINITIONS
 There are two categories of separation--Voluntary and Involuntary.
 1.0 Voluntary
 a. Resignation: Voluntary relinquishment of one's job.
 b. Leave of Absence (LOA): a form of resignation allowing a professional
 employee to pursue other activity for a period greater than 90
 days. LOA incorporates a mutual understanding that the University
 and the employee agree.
 2.0 Involuntary
 a. Severance--involuntary removal from employment because (1) the
 employee's position is annulled through reduction in force or
 reorganization, and an equivalent vacancy does not exist; or (b)
 the employee is unable to meet attendance requirements of the job
 because of ill health.
 [Page 2 of 9]
employee's behavior constitutes actual or potential injury to the department or
 University, he immediately recommends dismissal through channels to the
 President.
 3.0 The President may consider two courses of action:
 a. Accept the supervisor's recommendation and authorizes immediate
 dismissal; or
 b. Appoint a Dismissal Review which will act in the same manner as the
 Discharge Review Committee described above.
 4.0 Notice and Pay. Dismissals are made without advance notice. Salary
 entitlements ends as of the date of dismissal.
CLEARANCE
 The Director of Personnel conducts a separation exit interview with each
 voluntarily separating employee during the week before separation to elicit
 reasons for separation (OP FORM 013A) and obtains exit information from
 immediate supervisor on (OP FORM 013B).
CLEARANCE PROCEDURES
 Property Accounts and Loaned Items. The Director of Personnel must be notified
 two weeks prior to the termination date of employment. The Office of
 Personnel will provide a Termination Clearance Form (OP FORM 012) to the
 separating employee one week before the date of termination. The separating
 employee is responsible for returning all University property (charged
 equipment, library books, keys, credit cards, identification cards, and the
 like), and for obtaining
 [Page 3 of 9]
 activity, no further probation is required. The employee is not
 placed on notice under these circumstances but is discharged.
 3.0 Notice. The appropriate approval authority--the President, supervising
 Vice President, will furnish 60 days notice for discharge to exempt
 employees (a copy will be forwarded to the Director of Personnel). The
 discharge of a non-exempt employee if authorized, will provide such
 employee one month's notice. Employees are expected to work during the
 notice period.
 4.0 Pay. Regular pay will continue during the notice period, provided that
 (a) an employee does not begin employment with another employer during
 the notice period, or (b) if for any unauthorized reason the employee
 fails to report to work during the notice period. Categories (a) and
 (b) require documentation of the supervisor and must be on file in the
 Office of Personnel and a copy given or sent to the employee via
 registered mail.
DISMISSAL
 1.0 Supervisors are responsible for recommending actions. All recommendations
 for dismissal shall be reviewed by one higher level of authority.
 2.0 Supervisors and higher authorities will thoroughly investigate instances
 of misconduct and will weigh carefully and objectively at what point
 misconduct constitutes actual or potential injury to the University. If the
 supervisor determines that an
 [Page 4 of 9]
written clearance from the payroll section, and the Director of the Library,
 Administrative Services, Computer Services, and other areas depicted on the
 clearance form.
 When clearance has been completed, the Director of Personnel will authorize
 the Business Office to make final payment, less an outstanding obligation to
 the University. The employee is responsible for items that are not returned,
 and settlement must be made prior to issuance of the final pay check.
 Unused Annual Leave. Each employee will receive payment of unused annual leave
 accumulated up to a maximum of 240 hours.
 Final Payment. The final pay check, including any annual leave and less any
 outstanding obligations to the University will be mailed or directly
 deposited according to the university's pay schedule.
[Page 5 of 9]
 e. Discharge Review Committee. If requested by the employee, a Discharge
 Review Committee of three employees appointed by the President will
 be charged to review in an objective and impartial manner all
 discharge actions referred to it, and to advise the President of an
 appropriate course of action. It will inform the employee that the
 Committee has received for its review a recommendation for
 discharge. The Committee will investigate the facts and will be
 provided with pertinent documents by the Director of Personnel.
 Within five (5) working days of the receipt of all documents, the
 Committee will review and report its findings to the President and
 to the Director of Personnel. After considering the findings and
 recommendations of the Committee, the President may reject the
 recommendation for discharge, authorize discharge, or take other
 appropriate action. The President will record his decision in
 writing for placement in the employee's personnel file.
 f. Unsatisfactory Performance after Probation. An employee who
 successfully completes probation but lapes into the same or other
 unsatisfactory performance may be discharged without further notice
 or may be placed on probation a second time. If the employee
 successfully completes this second probation but subsequently
 performs unsatisfactorily or engages in the same unacceptable
 [Page 6 of 9]
 3.0 A definition of a probationary period not shorter than one month
 and no longer than three months in which corrective action is
 expected.
 4.0 A clear description of the conditions to be satisfied during the
 probationary period which will result in removal of the
 probationary status.
 5.0 A statement that separation will result if the employee is
 unsuccessful in meeting the specified objectives.
 c. Counseling During Probation. During the period covered by the
 probation, employees will have opportunities to discuss their
 status and conduct with their supervisors and the Director of
 Personnel.
 d. Probationary Performance Appraisal. At the end of the probation
 period, the supervisor will complete and submit (through channels)
 to the Director of Personnel a formal appraisal recommending either
 (1) removal from probation, or (2) discharge for unsatisfactory
 performance. The Director of Personnel will review the appraisal,
 make appropriate recommendations, and forward the appraisal and
 recommendation to the appropriate authority for action. If
 discharge is recommended, the Director of Personnel will prepare
 and forward to the employee written notification and of such
 recommendation. This notification informs the employee that, if
 he/she wishes, he/she may request the President to refer the action
 to the Discharge Review Committee. He/she must request such
 referral within five (5) working days of receipt of notification of
 recommended discharge.
 [Page 7 of 9]
 a. Performance Appraisal and Counseling. Performance appraisal by a
 supervisor is a continuous process. Formal performance appraisal is
 required annually; exceptionally good or poor performance should be
 discussed with the employee whenever it occurs. Counseling an
 employee regarding performance that is below expected standards is
 relied upon to resolve most transient problems of poor performance
 without formal action.
 b. Warning and Probation. In some cases, counseling is not effective.
 One critical event, or a series of marginal or unsatisfactory
 examples of substandard work, may persuade the supervisor that
 formal action is required. In such cases, the supervisor places the
 employee on probation. To establish probation, the supervisor
 informs the employee in writing that the performance is
 unsatisfactory. This formal warning is confidential; the supervisor
 provides a copy to the Director of Personnel for retention in the
 employee's file.
 The memorandum must contain the following.
 1.0 Specific identification of how the employee's performance is not
 meeting the standards and objectives set for the job.
 2.0 A summary of previous communications in which instances of
 unsatisfactory performance were conveyed to or discussed with
 the employee (prerequisite).
 [Page 8 of 9]
 SEPARATION AND NOTICE PROCEDURES
 REFER TO POLICY NO: IV:01:21
 1.0 Resignations are to be submitted in writing indicating the reasons for
 resignations and the desired effective date of separation. Letters of
 resignation by exempt employees are addressed to the University President and
 forwarded through supervisory channels to the Director of Personnel. Letters
 of resignation by non-exempt employees are addressed to the appropriate Vice
 President with a copy forwarded to the Director of Personnel. Resignations of
 exempt employees are to be submitted at least two months in advance and
 non-exempt employees at least one month in advance. Salary continues through
 the last day worked, and unless extenuating circumstances exist, this process
 will be followed to the letter.
 2.0 Supervisors are responsible for recommending to the appropriate authority
 severance actions within their activities.
 3.0 The President, Vice President, Dean or Director will furnish notice to
 employees and provide a copy to the Director of Personnel. The names of
 employees who are severed without cause will be placed on a re-employment
 list for one year, and will be considered for re-employment in order of
 length of time on the list when appropriate openings occur.
DISCHARGE
 1.0 Supervisors are responsible for recommending to the appropriate Vice
 President or President discharge actions within their activities.
 2.0 The following procedures must be carefully followed, fully documented, and
 executed by the designated authority:
 [Page 9 of 9]
 b.
 Discharge--involuntary removal from employment because of failure to
 perform designated duties or meet prescribed standards, including
 behavioral patterns such as repeated tardiness or unauthorized absence
 or adverse attitude toward University policies, supervisors, fellow
 employees, or work assignments.
 c.
 Dismissal--involuntary removal from employment because of dishonest
 behavior, or other forms of misconduct involving violation of law or
 University policy.
NOTICE
 A legal notice is defined as: A written declaration that an employee is being
 terminated or a written declaration from an employee that he/she is
 resigning. Both should conform to established time frames of two (2) weeks
 notice.
 
 
 [1]
 Lassiter apparently testified that he understood the contract to be a 12 month contract; he implies that the decision-maker would have shared that understanding. However, the contract language itself is clear that the contract extended from May 1, 1985, to September 30, 1985, and that it had to be extended by mutual agreement. Lassiter has pointed to no evidence of which I am aware that the decision-maker had knowledge of facts clearly indicating an extension by mutual agreement
 
 
 [1]
 Lassiter was terminated in June 1986 without a hearing. If he had no contract on this date, he had no property interest in continued employment and therefore a hearing was not required. If, on the other hand, as he contends, he was under contract until September 30, 1986, then his termination would have occurred within the contract period and under clearly established law he was entitled to a hearing
 
 
 [2]
 The contract between Lassiter and the university provided that:
 for the period from May 1, 1985 to*September 30, 1985, or for such portion of the period as your services are found satisfactory, and as the finances of the University permit at an annual salary $51,000, payable in 12 monthly payments, effective June 1, 1985....
 
 
 *
 This appointment and contract, which commence on May 15, 1985 and extend through September 30, 1985 (the end of the current fiscal year), would be extended through our mutual agreement, on October 1, 1985.