**Karen BOGLE, Plaintiff,**

v.

**The CITY OF WARNER ROBINS, et al., Defendants.**

No. 5:95–CV–328–1(DF).

United States District Court, M.D. Georgia, Macon Division.

Feb. 12, 1997.

---

Lynn Yount, Warner Robins, GA, William Michael Peterson, Warner Robins, GA, for Plaintiff.

Thomas F. Richardson, Christopher Dean Balch, Macon, GA, for Defendants.

FITZPATRICK, Chief Judge.

The above styled case is a civil rights action brought under 42 U.S.C. § 1983. Plaintiff claims in her suit that Defendants violated her constitutional rights when they released her from the Warner Robins Police Department while she was under the influence of a prescription drug, marijuana, and alcohol. Defendants have filed a motion for summary judgment as to all of Plaintiff's claims. Defendants argue that Plaintiff did not suffer a constitutional deprivation when she was released from the police department in an impaired state and that the individual police officers are entitled to qualified immunity. After careful consideration of the entire record, the Court enters the following order.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) authorizes summary judgment when all "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." For purposes of summary judgment the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Warrior Tombigbee Transport Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir.1983). If a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, summary judgment against that party is mandated. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## FACTS

The facts in this case are largely undisputed. On the night of August 9, 1994, the manager of Rivalry's bar complained to police about Plaintiff, a customer who was engaging in arguments and refusing to leave. Officer Scott Blaser of the Warner Robins Police Department arrived at the bar at approximately 10:00 p.m. and immediately confronted Plaintiff. Plaintiff was extremely upset and intoxicated when Officer Blaser approached her, and has admitted that her condition that night was due to beer, liquor and marijuana she had consumed earlier in the day. When Officer Blaser attempted to ask Plaintiff questions about her behavior she fought with him and cursed him. Finally, Officer Blaser arrested Plaintiff for disorderly conduct and profanity.

After arresting her and placing her in his car, Officer Blaser drove Plaintiff to the Warner Robins Police Department. Once there Plaintiff complained about pain in her leg and requested medical attention. In response, a police officer took Plaintiff to the Houston Medical Center, where she received an injection of Ativan from a hospital employee. After receiving this treatment Plaintiff was released from the hospital and transported back to the Warner Robins Police Department by Officer Derrick Lumsden. Officer Lumsden was given a copy of the hospital's discharge instructions, but he did not read them.

Officer Lumsden next transported Plaintiff to the Jones County Sheriff's Department. The sheriff's department, however, did not keep Plaintiff for very long. Shortly after she was dropped off the 'department informed the Warner Robins Police Department that they would have to return and pick up Plaintiff. Officer Lumsden complied with this request and transported Plaintiff back to the Warner Robins Police Department.

At approximately 2:10 a.m. Sgt. Harvey Brown, the supervisor on duty, informed Plaintiff that she was going to be released and that she could use the telephone to make arrangements for a ride home. Officer Lumsden has testified that Plaintiff picked up the phone and dialed, but that he does not know whether Plaintiff made a connection. Plaintiff states that she does not remember whether she used a telephone while she was at the police department, or whether she was even offered the use of a telephone. The policy of the police department is to allow individuals to make their own arrangements for a ride home, and to call a taxi for people who do not have a ride. None of the officers at the police department, however, remember Plaintiff asking them to call a taxi on the night in question.

Officer Lumsden has also testified that Plaintiff appeared to be coherent at the time she was released from custody and that, at that time, he had no concerns regarding her mental functioning. Officer Lumsden's testimony is corroborated by the testimony of Sgt. Brown, who also believed that Plaintiff was capable of navigating her way home. Plaintiff seeks to contradict this testimony by introducing the expert testimony of Dr. Charles Proctor. Dr. Proctor, who was not at the police department the night of Plaintiff's arrest but has reviewed the facts of this case, states that a person with a high blood ethanol level, such as Plaintiff had on the night she was arrested, who has been given an injection of Ativan, the drug Plaintiff received at the hospital, would most likely have marked muscular incoordination, visual impairment, and intermittent stupor. Based on this testimony, Plaintiff argues that her impairment must have been obvious at the time that she was released and that Defendants knew or should have known that she was in no way capable of safely navigating her way home.

Upon her release from custody, Plaintiff left the police department and began walking toward her home, which was approximately four miles away. Plaintiff contends that the neighborhood she had to walk through upon leaving the police department was more dangerous than the neighborhood in which Rivalry's, the bar at which she was arrested, is located. While Plaintiff was walking home a stranger approached her and she accepted a ride from him. Plaintiff states that the stranger made her drink something and smoke something, and then took her into a wooded area and raped her. After the alleged rape, the stranger took Plaintiff to Hardees and bought her a Coke, and then drove her to her home.

## CONCLUSIONS OF LAW

### 1. The City of Warner Robins

Plaintiff has named officers Blaser, Hart, Miller, Lumsden, and Brown in their individual as well as their official capacities. When defendants are named in their official capacities, the suit, for all purposes other than name, is against the government entity the defendants represent. *Kentucky v. Graham*, 473 U.S. 159, 165–66, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). Thus, Plaintiff's claims against the defendant officers in their official capacities must be treated as claims against the City of Warner Robins.

The United States Supreme Court has concluded that Congress included municipalities within the class of "persons" subject to liability for § 1983 violations.[1] *Owen v. City of Independence*, 445 U.S. 622, 646–47, 100 S.Ct. 1398, 1413, 63 L.Ed.2d 673 (1980). By doing so Congress abolished whatever claim to sovereign immunity cities had under state law. *Id.* To hold a city liable under § 1983 the plaintiff must prove that the city

---

1. While the City is a "person" subject to liability under § 1983, the Warner Robins Police Department is not. Thus, the Warner Robins Police Department is not a proper defendant in this action.

had a custom, policy or practice which was responsible for inflicting her constitutional injury. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989). The plaintiff must show a direct causal link between the city policy or custom at issue and the alleged constitutional deprivation. *Id.* These principles ensure that a city is held liable only when it was the moving force behind a constitutional deprivation inflicted upon the plaintiff. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986).

The City policy which Plaintiff contends caused her constitutional deprivation is General Order 92–05, which states:

All persons who are arrested will be searched by the arresting officer prior to entry into the processing facility. The arrestee shall be processed and either released or transferred within two (2) hours of the time he or she was brought into the facility.... **Arrestees are not to be held in the processing area for a period longer than two (2) hours. There are no exceptions.**

(emphasis in the original). Plaintiff argues that this policy requires officers to release arrestees who are not going to be transferred after the arrestee has spent two hours in the processing area, regardless of the arrestees' physical or mental condition. Plaintiff claims that, as a result of this policy, she was released from the City's police department in a substantially impaired state and, consequently, was unable to look after her own well being and was physically injured by a third party private citizen. Plaintiff claims that the officers' actions of releasing her while her mental and physical abilities were still impaired subjected her to danger, and therefore violated her rights under the Due Process Clause of the Fourteenth Amendment.

For the City to be liable for the injuries inflicted upon Plaintiff after she left the police department, Plaintiff must show that the City had a constitutional obligation to ensure Plaintiff's safety by holding her in the police department until she was in a condition to safely navigate her way home. *See Dollar v. Haralson County*, 704 F.2d 1540, 1543 (11th Cir.1983) ("In determining whether a constitutional deprivation has occurred, courts must examine whether the defendant was under any obligation to the particular plaintiff. The question of the existence of such a duty is an issue of law.") The City contends that the Constitution imposes no such obligation on its officers and that, consequently, a City policy did not inflict upon Plaintiff a constitutional deprivation.

In *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) the Supreme Court held that, as a general matter, a State's failure to protect an individual against private violence does not constitute a violation of the Fourteenth Amendment's Due Process Clause. 489 U.S. at 198, 109 S.Ct. at 1004. At the same time, however, the Court acknowledged that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *Id.* at 198, 109 S.Ct. at 1004. For Example, the Supreme Court has held that the Eighth Amendment prohibition against cruel and unusual punishment requires States to provide medical care to incarcerated prisoners. *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Under the Fourteenth Amendment, the Court has found that States must provide its involuntarily committed mental patients adequate food, shelter, clothing and medical care. *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). In *Taylor v. Ledbetter*, 818 F.2d 791 (11th Cir.1987) (en banc) the Eleventh Circuit held that the State had a duty to protect a child's safety when it involuntarily placed a child in a foster home. The *Taylor* court reached this conclusion upon its finding that the foster home situation was sufficiently analogous to a prisoner in a penal situation so as to demand that the State take responsibility for the child's well being. In each of these cases the court premised its finding of a "special relationship," on the fact that the State had imposed a limitation on the complaining individual's freedom to act on his own behalf. *DeShaney*, 489 U.S. at 199–200, 109 S.Ct. at 1005–06; *Taylor*, 818 F.2d at 797 ("The chil-

dren are helpless. Without the investigation, supervision, and constant contact required by statute, a child placed in a foster home is at the mercy of his foster parents.").

■ Adhering to this reasoning, the Eleventh Circuit has characterized the cases giving rise to a special relationship as existing along a continuum:

At one extreme is the person whom the state has completely deprived of his liberty by either incarceration or institutionalization, such as a prison inmate, *see Estelle, supra,* or an involuntarily committed mental patient, *see Youngberg, supra.* The rights of the individual and the corresponding duties of the state are clearest and strongest in those contexts. Still protected, but somewhat further in along the continuum, are pretrial detainees, *See Hamm v. DeKalb Co.,* 774 F.2d 1567 (11th Cir.1985) and arrestees or suspects in police custody, *see City of Revere,* 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983). At the opposite end of the continuum, however, are "members of the general public, living in the free society, and having no special custodial or other relationship with the state." *Fox v. Custis,* 712 F.2d 84, 88 (4th Cir.1983). Clearly, no right-duty relationship exists between those individuals and the state. *See id; Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982). In most cases, to establish a special relationship which creates a duty on the part of the state, the plaintiff must show that his situation lies closer to the "incarceration" or "custody" end of this continuum than it does to the "unrestricted" or "free" end.

*Wideman v. Shallowford Community Hosp., Inc.,* 826 F.2d 1030, 1035 n. 6 (11th Cir.1987). The key concept in determining where on the continuum a given case belongs is the degree to which the State exercises coercion, dominion, or restraint over the individual. *Id.* at 1035–36; *DeShaney,* 489 U.S. at 199, 109 S.Ct. at 1005 (The rationale for imposing on

States the duty to care and protect certain individuals is "simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provides for his basic human needs.... it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause."). "The state must somehow significantly limit an individual's freedom or impair his ability to act on his own before it will be constitutionally required to care and provide for that person." *Wideman,* 826 F.2d at 1036.

■ Plaintiff makes no argument that any injury was inflicted upon her while she was in the custody of the Warner Robins Police Department. Rather, Plaintiff alleges that she suffered injury after she was released from police custody. Consequently, Plaintiff's injuries did not result form the City's direct restraint on her freedom to act for herself. Neither were Plaintiff's injuries caused by *the City's* impairment of her ability to act on her own behalf. The court concedes that Plaintiff may be able to show that she was in an impaired state and unable to act for herself at the time she was released from police custody. However, Plaintiff cannot show that her impaired state was the result of any actions *taken by the City.* By her own admission, Plaintiff's impaired state was a result of the alcohol, marijuana and prescription drug which were in her system. The City was not itself responsible for these drugs being in Plaintiff's system,[2] thus the City cannot be said to have inflicted Plaintiff's impairment upon her. In other words, the City cannot be said to have limited Plaintiff's freedom or impaired her ability to act on her own because it did nothing to contribute to Plaintiff's impaired state. Without such action by the City, the Court cannot conclude that Plaintiff's relationship to the City on the night in question was so

---

**2.** Importantly, Plaintiff was taken to the hospital because of her own request for medical treatment. Plaintiff has made some reference to discharge papers that were given to Officer Lumsden when he picked Plaintiff up from the hospital, which he admittedly never read. Neither party, however, has produced the content

of those papers, presumably because they have since been lost. Because the court has no indication of the content of Plaintiff's discharge papers, it cannot attribute any significance to the discharge papers in deciding whether or not Defendant's subjected Plaintiff to a constitutional deprivation.

analogous to a prisoner in custody or a child in foster care as to give rise to a duty on the part of the City to protect her from outside harm.

Plaintiff argues that a special relationship did exist between the City and herself because the City increased her risk of harm by (1) taking her to the hospital where she received an injection of Ativan, which increased her incapacity, and (2) moving her from the bar where she was, Rivalry's, to the police department, which Plaintiff contends is in a more dangerous neighborhood than Rivalry's neighborhood. Plaintiff bases her argument that these actions gave rise to a duty on the part of the City to protect Plaintiff on dicta in *DeShaney*.

In *DeShaney* a young child was severely abused by his father with whom he lived. The child and his mother brought suit against the Department's department of social services on the theory that the department had a duty to intervene to protect the child because it knew or should have known of the risk the father posed to the child. The *DeShaney* Court ultimately held that the failure of the government actors in the case to "rescue" the young child from his abusive father did not constitute a constitutional violation. 489 U.S. at 197–202, 109 S.Ct. at 1004–06. The dicta in *DeShaney* which Plaintiff relies on is the Court's notation that:

> While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.

*Id.* at 200–02, 109 S.Ct. at 1006. While the facts in *DeShaney* were such that the State did *nothing* to render the Plaintiff more vulnerable to the established risk[3], the Court did not indicate that, had the State indirectly increased the risk to *any* degree, it would have found a duty on the part of the Department to protect the child. Rather, the Supreme Court opinion emphasized that, "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expression of intent to

help him, *but from the limitation which it has imposed on his freedom to act on his own behalf.*" *Id.* at 199–202, 109 S.Ct. at 1005–06 (emphasis added). Furthermore, the *DeShaney* Court stated, "In the substantive due process analysis, it is the States' affirmative act of restraining the individual's freedom to act on his on his own behalf— through incarceration, institutionalization, or other similar restraining of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause." *Id.* at 200, 109 S.Ct. at 1006. As discussed above, the City in this case did not limit Plaintiff's freedom to act on her own behalf.

The Eleventh Circuit's opinion in *Wideman* also suggests that any increase in risk to Plaintiff in this case did not give rise to a constitutional duty to protect on the part of the City. In *Wideman* a pregnant woman called 911 and requested an ambulance to take her to a specific hospital where her doctor was waiting for her. The ambulance attendants, however, refused on the basis of a county policy to take the woman to the requested hospital and, instead took her to another hospital. After considerable delay the woman was transferred to the hospital she initially requested, but by the time she arrived her doctor could not stop her labor and the woman gave birth to a premature baby who survived for only four hours.

The *Wideman* court held that the fact that the County undertook to provide some ambulance service to its residents did not give rise to a constitutional duty to perform the particular service desired by the plaintiff. In making this conclusion the court stated, "Even if it could be argued that the County's conduct somehow heightened the peril [plaintiff] faced, [plaintiff] still would not state a constitutional claim." *Wideman*, 826 F.2d at 1037; *see also Bradberry v. Pinellas County*, 789 F.2d 1513, 1517 (11th Cir.1986) (even if an attempted rescue by a Department actor heightens the peril a plaintiff faces, that conduct does not constitute a constitutional deprivation of life without liberty). Given the

---

3. Even in *DeShaney*, however, one could argue that the State did indirectly increase the child's risk of harm by creating the appearance that it

was protecting the child's safety, thereby discouraging other interested private individuals from taking action on the child's behalf.

reasoning of this case and the *DeShaney* case, the Court can not agree that the alleged indirect increase in Plaintiff's risk of harm required that the City protect Plaintiff from the violence of a third party after she left the custody of the police department.

The Eleventh Circuit has often recognized in cases involving Department inaction that the United States Constitution is a charter of negative, rather than positive liberties. As such, it "limits the actions the states can take rather than mandating specific obligations." *Bradberry,* 789 F.2d at 1517. In this case, the Constitution imposed no affirmative obligation on the City to ensure Plaintiff's safety after she left the police department. Consequently, Plaintiff did not suffer a deprivation of a constitutional right when she was attacked by a private third party and the City is due summary judgment as to Plaintiff's claim.[4]

### 2. *Defendants in their Individual Capacities*

Defendants also move for summary judgment on behalf of all the police officers named in their individual capacities. The Court has already held that Plaintiff did not suffer a deprivation of her constitutional rights as a result of Defendants' actions on the night she was arrested. This holding alone is an adequate basis on which to grant the individual officers' motion for summary judgment. However, the individual officers have an additional ground on which they are entitled to summary judgment—qualified immunity.

Qualified immunity protects individual police officers from liability under § 1983 unless the plaintiff can prove that the officers violated a "clearly established" constitutional right. *Hamilton v. Cannon,* 80 F.3d 1525, 1528 (11th Cir.1996). For a constitutional right to be "clearly established" to the point

that qualified immunity does not apply, "the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law." *Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146, 1149 (11th Cir.1994) (en banc). The Eleventh Circuit has repeatedly emphasized that plaintiffs may not discharge their burden of showing that a constitutional right is clearly established by referring to general rules of law. *See, e.g., Hamilton,* 80 F.3d at 1532; *Lassiter,* 28 F.3d at 1150. The cases relied upon by the plaintiff must be materially similar to the facts of the case at issue because "[p]ublic officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases." *Lassiter,* 28 F.3d at 1150.

■ Plaintiff has directed the Court to no case which holds that an individual has a constitutional right to have her safety ensured by law enforcement after she has been released from police custody.[5] While Plaintiff has cited the Court to cases which acknowledge that, in certain circumstances, a special relationship may be formed between the Department and an individual which imposes a duty on the Department to ensure the individual's safety, such "special relationships" have only been found to exist when the individual is in custody, incarcerated, or otherwise under the control of the State. The cases, therefore, are of no help in establishing a constitutional right under the facts of this case. *See Hamilton,* 80 F.3d at 1532 (the facts of the case relied upon must be materially similar); *Malley v. Briggs,* 475 U.S. 335, 340–41, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) (qualified immunity protects all but the plainly incompetent and those who knowingly violate the law).

---

**4.** As the Court has decided that Plaintiff has suffered no constitutional violation in this case, it need not address Plaintiff's contention that the City had a policy of inadequately training its law enforcement officers.

**5.** As discussed above, Plaintiff has directed the Court to some language in DeShaney which could suggest that the officers may be held liable under § 1983 because they indirectly increased

the risk of harm to which Plaintiff was exposed. The language cited from DeShaney, however, is clearly dicta because it in no way is essential to the holding in DeShaney. "The law cannot be established by dicta. Dicta is particularly unhelpful in qualified immunity cases where we seek to identify clearly established law." *Hamilton,* 80 F.3d at 1530.

"[T]he contours of what constitutes a 'special relationship' between a municipality, acting through its officials, and its citizens are hazy and indistinct." *Wideman,* 826 F.2d at 1035, *quoting Ellsworth v. City of Racine,* 774 F.2d 182, 185 (7th Cir.1985). Given the lack of definition of what constitutes a "special relationship," the Court cannot conclude that the individual officers in this case knew that their release of Plaintiff while she was in an impaired state were actions that every reasonable officer in their position would have known was wrong. *See also Courson v. McMillian,* 939 F.2d 1479 (11th Cir.1991) (officers' act of leaving plaintiff alone at the side of a highway late at night without transportation home after he arrested the driver of the car she was riding in and informed her that she was free to go home did not violate plaintiff's clearly established Fourteenth Amendment rights); *Hilliard v. City & County of Denver,* 930 F.2d 1516 (10th Cir. 1991) (officer who left intoxicated female in a high crime area with no transportation home, who was subsequently sexually assaulted and later found naked, bleeding and unconscious, did not violate the plaintiff's clearly established constitutional rights). Accordingly, the individually named defendants are entitled to summary judgment on the additional basis of qualified immunity.

## CONCLUSION

For all the reasons discussed above, the Court finds that Plaintiff was not deprived of her constitutional rights under the Fourteenth Amendment when police officers released her from custody in an impaired state. The Court further finds that the individual police officers did not violate a clearly established constitutional right of Plaintiffs, and therefore are entitled to qualified immunity. Accordingly, Defendants' motion for summary judgment is hereby **GRANTED.**