**Joseph P. FLOOD, Plaintiff,**

v.

**STATE OF ALABAMA DEPARTMENT OF INDUSTRIAL RELATIONS, et al., Defendants.**

Civil Action No. 95–T–933–N.

United States District Court, M.D. Alabama, Northern Division.

Dec. 10, 1996.

Charles Michael Quinn, C. Paige Williams, Rocco Calamusa, Jr., Gordon, Silberman, Wiggins & Childs, Birmingham, AL, for Joseph P. Flood.

Susan B. Anderson, Alabama Securities Commission, Montgomery, AL, Courtney Wayne Tarver, Office of the Attorney Gener-

al, Jeff Sessions, Attorney General, Montgomery, AL, for State of Alabama Department of Industrial Relations ("DIR") Lenora Pate, Grady Simpson, Frank Willett, Jr.

Susan B. Anderson, Alabama Securities Commission, Montgomery, AL, for Dottie Czyienski.

### ORDER

MYRON H. THOMPSON, Chief Judge.

Plaintiff Joseph P. Flood brought this lawsuit claiming that the defendants deprived him of rights protected by the first amendment to the United States Constitution, as enforced through 42 U.S.C.A. § 1983; that they violated the State Employees Protection Act (hereinafter referred to as "SEPA"), 1975 Ala.Code §§ 36–26A–1 through 36–26A–7; and that they committed the state-law tort of invasion of privacy. The defendants are the Alabama Department of Industrial Relations (hereinafter referred to as "DIR") and three of its officials: Dottie Cieszynski, the current director, Lenora Pate, the former director, and Frank Willett, the administrator of the workers' compensation division. The court has jurisdiction pursuant to 28 U.S.C.A. §§ 1343 & 1367. This lawsuit is now before the court on the defendants' motions for summary judgment. For the reasons that follow, summary judgment will be granted in part and denied in part.

### I. SUMMARY–JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–1117 (11th Cir.1993) (discussing how the responsibilities on the movant and the nonmovant vary depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or nonmovant bears the burden of proof at trial). In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### II. BACKGROUND

Considered in the light most favorable to Flood, the nonmoving party, the facts are as follows. Shortly after Flood began as a workers' compensation examiner for DIR in November 1992,[1] his supervisor asked him to look into possible problems with some employee leasing companies.[2] An employee leasing company employs workers and then "lease" them to other companies. The employee leasing company is responsible for its workers' paperwork and for providing benefits. It is also responsible for arranging for workers' compensation insurance for its employees. Flood discovered that some of the employee leasing companies doing business in Alabama had insufficient workers' compensation insurance, in violation of Alabama law. He informed his supervisor, and he told him to keep investigating the problem.[3]

Eventually, in July 1993, Flood arranged for a meeting with representatives of companies that were clients of an employee leasing company. Flood intended to inform the representatives that the leasing company did not have sufficient workers' compensation insurance.[4] On the eve of the meeting, Frank Willett, the acting administrator of the workers' compensation division, called Flood at home and told him that Lenora Pate, the director of DIR, had received a call from the governor's office regarding the scheduled meeting and that Pate did not want Flood to

---

**1.** Flood aff. at 1, ex. 1 to plaintiff's memorandum in opposition to defendants' motions for summary judgment, filed on May 23, 1996.

**2.** *Id.*

**3.** *Id.* at 1–2.

**4.** *Id.* at 2.

follow through with the meeting.[5] Pate and Willett later told Flood to stop investigating the employee leasing companies and to limit himself to only those tasks included in his job description.[6]

In February 1994, the Federal Bureau of Investigation, more popularly known as the FBI, raided an employee leasing company in California. On February 10, shortly after the raid, a Montgomery television station went to Flood's house to discuss the California case and its connection to companies in Alabama. Flood briefly discussed the case with the reporter and then told him to contact Flood's supervisors at DIR.[7] In late February 1994, an FBI agent approached Flood and asked him questions about some employee leasing companies.[8] After Flood's supervisors learned of his contact with the press and the FBI, they told him that he was in serious trouble. Willett told Flood that Pate thought of him as a "loose cannon," [9] and that she was "looking for a reason to discipline [him] for speaking to the press." [10]

DIR has policies regarding employee contact with the news media and employee involvement in investigations, including contact with the FBI.[11] News releases involving "[i]tems of statewide application and those concerning more than one local office area" must be "prepared or reviewed by the Public Information Officer and released from the Central Office with the approval of the Department Director." "Local office managers may respond to requests from local news media on local items which are of general information, avoiding controversial issues unless cleared in the Central Office." [12] Furthermore, employee contact with the FBI "is . . . to be coordinated with the special investigator." [13] In other words, if a DIR employee uncovered what he thought was fraudulent or otherwise illegal activity, DIR policy called for him "to involve his superiors in some way" before contacting or meeting with the FBI.[14]

On March 10, 1994, Flood and his then-attorney, Julian McPhillips, held a press conference during which Flood spoke about employee leasing companies and DIR's slow response to the problems with workers' compensation insurance.[15] After the press conference, Pate, Willett, and others told Flood that he should not speak to the press, and that he should keep his "mouth shut and just do [his] job." [16] One supervisor called him a "son of a bitch," [17] and another warned him that "it is hard to do anything when [you're] floating at the bottom of the Alabama River with a rock tied to your leg." [18] In addition, Flood's telephone calls were monitored, he was given more work than other employees, and his work was scrutinized more closely than that of other employees.[19] Some time

---

**5.** *Id.* at 3.

**6.** *Id.;* Flood dep. at 143–144, 148, attached to defendants' submission in support of motion for summary judgment, filed on June 11, 1996.

**7.** Flood aff. at 3, ex. 1 to plaintiff's memorandum in opposition to defendants' motions for summary judgment, filed on May 23, 1996.

**8.** *Id.*

**9.** Flood dep. at 14, attached to defendants' submission in support of motion for summary judgment, filed on June 11, 1996.

**10.** *Id.* at 14–15.

**11.** Policy on releasing news items, March 30, 1987, ex. 30 to plaintiff's memorandum in opposition to defendants' motions for summary judgment, filed on June 14, 1996.

**12.** *Id.*

**13.** Pate dep. at 152, attached to defendants' submission in support of motion for summary judgment, filed on May 23, 1996.

**14.** *Id.* at 154.

**15.** Transcript of press conference, ex. 9 to Flood dep., attached to defendants' submission in support of motion for summary judgment, filed on June 11, 1996.

**16.** Flood aff. at 4, ex. 1 to plaintiff's memorandum in opposition to defendants' motions for summary judgment, filed on May 23, 1996.

**17.** Flood dep. at 14, attached to defendants' submission in support of motion for summary judgment, filed on June 11, 1996.

**18.** Flood aff. at 5, ex. 1 to plaintiff's memorandum in opposition to defendants' motions for summary judgment, filed on May 23, 1996.

**19.** *Id.* at 4.

shortly after March 10, DIR initiated a background check to look into the military and education records Flood had listed on his application for employment.[20] According to Flood, as part of this investigation, his employment application—which contained "confidential information concerning" him—was mailed "out all over the State of Oklahoma." [21] Flood claims that, because he had done undercover police work in Oklahoma, the confidential information DIR released put him and his family in danger. DIR also attempted to confirm Flood's educational credentials. Finally, as part of the background check, DIR inquired about Flood's parents and "their social status." [22] According to DIR, the background check was entirely routine. Indeed, DIR maintains that it performed similar checks on 16 other employees at the same time it investigated Flood.

On April 19, 1994, Flood complained in a letter to Pate that DIR was improperly conducting an investigation into his background, "harassing" him, "piling on ... undue additional work," and "continually criticizing him." [23] He asked that DIR stop the background investigation and "cease" its harassment of him.[24] Flood stated that "[a]ll he has done is expose wrongdoing and fraud in workers' compensation payments, and further revealed the lack of aggressive pursuit of the same by the Department of Industrial Relations." [25] Flood stated that DIR's investigation into his background "may very well violate his rights under the First Amendment to the U.S. Constitution and the State Whistleblowers Act." [26]

On May 3 and 4, 1994, in response to a subpoena, Flood was interviewed by employees of the Alabama Attorney General's Office. During the interview, Flood set forth in detail his complaints about employee leasing companies and what he now considered to be DIR's suspicious refusal to investigate these companies' failure to obtain workers' compensation insurance.[27] The Attorney General's staff reduced Flood interview to a written report.[28]

As a result of the background check, increased scrutiny, and abusive language, Flood suffered "a near heart attack" on August 1, 1994.[29] After this, he took sick leave until late August. While Flood was out on sick leave, Pate wrote to him at home to inform him that the investigation into his employment application had turned up some discrepancies and asked to meet with him.[30] Flood then asked several times to be transferred to other work, but his request was never granted.[31] Flood submitted a letter of resignation on November 1, 1994, which Pate accepted but backdated to October 6, 1994.

On July 13, 1995, Flood filed this lawsuit against DIR, Pate, and Willett. Flood sued Pate and Willett in both their official and individual capacities. However, because Pate had left DIR in January 1995, the court entered an order on May 3, 1996, substituting Cieszynski in her official capacity for Pate. Therefore, Cieszynski is a defendant

20. Id.

21. Flood dep. at 20, attached to defendants' submission in support of motion for summary judgment, filed on June 11, 1996.

22. Id. at 22; Supplementary report of July 15, 1994, from Leonard H. Kiser to Lenora Pate, ex. 10 to plaintiff's memorandum in opposition to defendants' motions for summary judgment, filed on May 23, 1996.

23. April 19, 1994, letter from McPhillips and Waites to Pate, ex. 23 to plaintiff's memorandum in opposition to defendants' motions for summary judgment, filed on May 23, 1996.

24. Id.

25. Id.

26. Id.

27. Ex. 35 to brief in support of plaintiff's motion to reconsider, filed July 19, 1996.

28. Id.

29. Flood aff. at 5, ex. 1 to plaintiff's memorandum in opposition to defendants' motions for summary judgment, filed on May 23, 1996.

30. September 2, 1994, letter from Pate to Flood, ex. 4 to Flood dep., attached to defendants' submission in support of motion for summary judgment, filed on June 11, 1996.

31. Flood aff. at 5, ex. 1 to plaintiff's memorandum in opposition to defendants' motions for summary judgment, filed on May 23, 1996.

in her official capacity only, Pate in her individual capacity only, and Willett in both his official and individual capacities.

### III. CLAIMS AGAINST DIR

■■■ Both Flood's federal and state claims are asserted against DIR. Because DIR is a State agency, the eleventh amendment to the United States Constitution bars all claims against it. "[A] suit in which the State or one of its agencies or departments is named as defendant is proscribed by the Eleventh Amendment." *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984). "This jurisdictional bar applies regardless of the nature of the relief sought." *Id.* This bar also applies regardless of whether the claim is based on state law or federal law. *Id.* at 104–106, 104 S.Ct. at 910–911. Indeed, Flood admits that, because DIR is a State agency, it is immune from suit for damages and injunctive relief.

### IV. FEDERAL CLAIM

Flood claims that the defendants violated his rights under the first amendment, as enforced by § 1983, by harassing and constructively discharging him after he spoke out about DIR's handling of employee leasing companies. He brings this claim against Cieszynski in her official capacity, Pate in her individual capacity, and Willett in his official and individual capacities.

#### A. *Official capacity: claim for damages*

■■■ As stated, Flood sues Cieszynski and Willett for damages in their official capacities. Official-capacity lawsuits are, "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). Because damages are recovered from the government entity itself and not the official's personal assets, the real party in interest is the entity and not the official personally. *Id.* The eleventh amendment to the United States Constitution bars damage actions against states in federal court absent a waiver by the state or valid congressional action allowing suit, *Graham,* 473 U.S. at 169, 105 S.Ct. at 3107, and this bar extends to suits against state officers and employees sued for damages in their official capacities, *id.; Jackson v. Georgia Dept. of Transp.,* 16 F.3d 1573, 1575 (11th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 320, 130 L.Ed.2d 281 (1994). Because there is no waiver here, Flood may not recover any damages from Cieszynski and Willett in their official capacities.

#### B. *Official capacity: claim for injunctive relief*

■■■ Flood also seeks reinstatement and backpay from Cieszynski and Willett in their official capacities. Although "the Eleventh Amendment insulates states from suit in Federal court," *Welch v. Laney,* 57 F.3d 1004, 1008 (11th Cir.1995), it "does not insulate state officials acting in their official capacities from suit in federal court, at least to the extent the complainant seeks prospective injunctive relief." *Id.* Therefore, the eleventh amendment poses no bar to this claim to the extent Flood seeks reinstatement.

■■■ However, the eleventh amendment bars any recovery of backpay. Because "backpay, whether viewed as damages for illegally terminated employment or as an aspect of equitable relief, is . . . retroactive in nature," *Hander v. San Jacinto Junior College,* 519 F.2d 273, 278 (5th Cir.), *opinion clarified on denial of rehearing,* 522 F.2d 204 (5th Cir.1975) (per curiam),[32] the award is barred by the eleventh amendment if it is to come from State funds. *Id.; Kendrick v. Jefferson Co. Bd. of Educ.,* 932 F.2d 910, 913 (11th Cir.1991); *see also Parker v. Wallace,* 596 F.Supp. 739, 746 (M.D.Ala.1984) ("Any award of backpay from the defendants in their official capacities as state officials, whether viewed as damages for illegally dismissing Parker or an aspect of equitable relief, would be retroactive and must come from the state treasury. Such an award is barred by the eleventh amendment to the

---

**32.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

U.S. Constitution."). Because a backpay award, to the extent Flood seeks it from Cieszynski and Willett in their official capacities, would come from State funds, Flood may not recover the award from these two defendants in their official capacities.

As to whether Flood should be reinstated, he claims that DIR constructively discharged him because of his statements to the press and the FBI concerning employee leasing companies. To prevail on this claim, he must satisfy a four-part test. *Fikes v. City of Daphne,* 79 F.3d 1079, 1083 (11th Cir.1996). First, the court must determine whether Flood's speech "involved a matter of public concern." *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983). This element is commonly referred to as the *Connick* test. Second, the court must balance "the employee's first amendment interests against the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." *Bryson v. City of Waycross,* 888 F.2d 1562, 1566 (11th Cir. 1989) (citing *Pickering v. Board of Educ. of Township High School Dist. 205,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)). This element is commonly referred to as the *Pickering* test. Third, the court must determine whether Flood's speech played a "substantial part" in his discharge. *Fikes,* 79 F.3d at 1084. Finally, if Flood "shows that the speech was a substantial motivating factor" in his discharge, the defendants may still prevail if they "prove by a preponderance of the evidence that they would have reached the same decision in the absence of the protected conduct." *Id.* at 1085.

 *Public concern:* "Speech addresses a matter of public concern when the speech can be 'fairly considered as relating to any matter of political, social, or other concern to the community.'" *Fikes,* 79 F.3d at 1084 (quoting *Connick,* 461 U.S. at 146, 103 S.Ct. at 1690). On March 10, 1994, Flood held a press conference at which he described the "serious and fraudulent practices

of employee leasing companies and [DIR's] slow response."[33] Several factors compel the conclusion that Flood spoke about an issue of public concern. First, Flood spoke about a State agency and its slow response to a problem having a state-wide reach. Second, he spoke in public, to the local media, with the intention of having his concerns conveyed to the general public. Third, he held the press conference only after he had concluded that DIR was inadequately responding to an issue that had state-wide importance. Finally, that the local media were sufficiently interested in what Flood had to say to attend his press conference is evidence that what he was saying was a matter of public concern. Certainly, the question of whether companies doing business in Alabama had sufficient insurance to cover workers' compensation claims "must be considered an issue of political or social concern." *Fikes,* 79 F.3d at 1084. Further, by holding the press conference and stating that DIR had failed to ensure that employee leasing companies maintain adequate insurance, Flood sought to "inform the public that [DIR] was not discharging its governmental responsibilities," and "bring to light actual or potential wrongdoing or breach of public trust on the part of" DIR. *Connick,* 461 U.S. at 148, 103 S.Ct. at 1690–1691. Indeed, because "a core concern of the first amendment is the protection of the 'whistle-blower' attempting to expose government corruption," *Bryson,* 888 F.2d at 1566, such speech is considered to be of great public concern. *Fikes,* 79 F.3d at 1084. The court is therefore convinced that, for the purposes of summary judgment, Flood has satisfied the *Connick* test and shown that he spoke about an issue of public concern.

 *Weighing of interests:* This test requires the court to "strike the proper balance between the interest of that employee in speaking freely and the interests of the state, as an employer, in promoting the efficient delivery of public services." *Waters v. Chaffin,* 684 F.2d 833, 836 (11th Cir.1982). To do this, the court "must consider several factors:

---

**33.** Flood aff. at 4, ex. 1 to plaintiff's memorandum in opposition to defendants' motions for summary judgment, filed on May 23, 1996.

(1) whether the speech at issue impeded the government's ability to perform its duties effectively; (2) the manner, time and place of the speech; and (3) the context within which the speech was made." *Fikes*, 79 F.3d at 1084. In addition to these factors, the court must also consider the nature of the employee's job, *Bates v. Hunt*, 3 F.3d 374, 378 (11th Cir.1993), and the nature of the employer's mission. *Busby v. City of Orlando*, 931 F.2d 764, 774 (11th Cir.1991). A "confidential" or "policy-making" employee—one who works closely with the leaders of the organization and is privy to confidential information—is expected to be loyal to his employers, and therefore "does not have much protection under the First Amendment when he speaks or acts in a hostile way toward his employer." *Bates*, 3 F.3d at 378. Other employees who have less responsibility will receive more protection. In addition to considering the nature of the employee's job, the court must consider the nature of the organization and the services it provides. Some organizations, such as police departments, must maintain "loyalty, discipline, morale, and a favorable reputation with the public," *Busby*, 931 F.2d at 774, in order to effectively perform their duties and efficiently deliver services to the public. Other organizations can tolerate more dissent and still efficiently perform their duties. Finally, and "more simply," in conducting this balancing test, the court must keep in mind that "one who cheers for the robbers has no right to ride with the police." *Sims v. Metropolitan Dade County*, 972 F.2d 1230, 1236 (11th Cir.1992).

Several factors weigh in favor of DIR. First, DIR had an important interest in ensuring that it speak with one voice and that its investigations proceed in an orderly manner. To further these interests, DIR had a policy requiring that contact with the news media regarding controversial issues and issues of state-wide importance be done only through a central office. The defendants maintain that Flood violated this policy when he spoke to the media on February 10 and held a press conference on March 10. Further, under DIR policy, Flood was supposed to inform his supervisors whenever he had occasion to speak to the FBI. DIR maintains that Flood violated this policy in February 1994 when, acting alone, he set up a meeting with the FBI. According to Pate, Flood had "no authority to directly contact the FBI without [her] expressed authority." [34] Second, Flood was a confidential employee because, although Pate and Willett did not entrust him with their secrets, he had learned some confidential information during the course of his investigation, and DIR had a legitimate interest in ensuring that he did not disclose this information. Although Flood did not reveal any confidential information during the March 10 press conference, he could have, and DIR has an interest in ensuring that its employees do not disclose confidential information. Finally, DIR maintains that Flood's assertion at the March 10 press conference that DIR was not following up on allegations of fraud was simply false because it was investigating the very issues about which Flood was concerned, albeit through its special investigations unit. The defendants maintain that DIR's interests in maintaining an efficient work environment, speaking with one voice, coordinating investigations through one unit, and disclosing accurate information outweigh any interest Flood might have in speaking publicly.

Despite DIR's legitimate concerns, Flood has presented substantial evidence to support the inference that his interest in free speech outweighed DIR's interest in promoting the efficiency of its services. First, Flood was not a policy-making employee. Indeed, one of Flood's frustrations was that he was not allowed to determine the scope and direction of the investigation into employee leasing companies. Second, DIR's work (monitoring businesses in Alabama for compliance with State regulations) does not require that its staff have the same degree of loyalty and internal cohesion as would be necessary for, for example, a police force, *Busby*, 931 F.2d at 774, or a governor's cabinet. *Bates*, 3 F.3d at 378–379. Indeed, the defendants insist that they took no negative action against Flood for his statements at the press conference. Thus, while they were

---

**34.** Memorandum from Pate to Willett, February 25, 1994, ex. 9 to plaintiff's memorandum in opposition to defendants' motions for summary judgment, filed on May 23, 1996.

disappointed that he had not been a team player, they apparently did not regard him as completely disloyal. The court is convinced that Flood's attempts to draw attention to DIR's slow response to a serious problem were designed to ensure that the State effectively monitored employee leasing companies. Third, it appears that, even after his remarks at the March 10 press conference, Flood was still regarded as a capable worker, and was thought to be able to do his job effectively. Finally and most significantly, Flood was drawn out into the open not because his concern about the employee leasing companies but rather because of his concern that DIR's failure to act was suspicious. In other words, the object of Flood's concern had become DIR itself. DIR's policies regarding public comments and contact with law enforcement were therefore not directly applicable, because the policies addressed possible improper conduct by private entities regulated by DIR, not improper conduct by DIR itself. Indeed, it could be argued that Flood went to others, including the public, only because DIR's own internal procedures had proved adequate.

Taken together, this evidence raises a dispute as to whether Flood's comments had a disruptive effect on the inner workings of the department, and whether they undermined DIR's ability to fulfill its mission.

■ *Constructive discharge:* As stated, Flood claims that, after he spoke publicly about DIR and the employee leasing companies on March 10, he was harassed and physically threatened by supervisors, given additional work, and subjected to an extensive and intrusive background check. He claims that his resignation in the face of such treatment amounted to constructive discharge. DIR maintains that Flood resigned voluntarily and that the conditions of his employment were not affected by his remarks during the press conference.

■ "To show constructive discharge, the employee must prove that his working conditions were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Wardwell v. School Bd. of Palm Beach County, Fla.,* 786 F.2d 1554, 1557 (11th Cir.1986). To make this determination, the court can consider the duration of the allegedly difficult conditions, *Hill v. Winn–Dixie Stores, Inc.,* 934 F.2d 1518, 1527 (11th Cir.1991), and the amount of extra work the employee was allegedly required to perform. *Wardwell,* 786 F.2d at 1557. The focus of the inquiry is whether the conditions, taken together, "constitute ... intolerable working conditions." *Id.* at 1558.

Flood has presented to the court a genuine issue of material fact as to whether he was constructively discharged. First, supervisors subjected him to abusive language, telling him that Pate thought of him as a "loose cannon,"[35] and that she was "looking for a reason to discipline [him] for speaking to the press."[36] One supervisor called him a "son of a bitch,"[37] and another warned him that "it is hard to do anything when [you're] floating at the bottom of the Alabama River with a rock tied to your leg."[38] Further, Pate, Willett, and others told Flood that he should not speak to the press, and that he should keep his "mouth shut and just do [his] job."[39] Further, Flood's telephone calls were monitored, he was given more work than other employees, and his work was scrutinized more closely than that of other employees.[40] Finally, DIR initiated a background check to investigate Flood's military and education records.[41] DIR released confidential information, inquired about Flood's parents, and went beyond the investigation

---

**35.** Flood dep. at 14, attached to defendants' submission in support of motion for summary judgment, filed on June 11, 1996.

**36.** *Id.* at 14–15.

**37.** *Id.* at 14.

**38.** Flood aff. at 5, ex. 1 to plaintiff's memorandum in opposition to defendants' motions for summary judgment, filed on May 23, 1996.

**39.** *Id.* at 4.

**40.** *Id.*

**41.** *Id.*

necessary to confirm the details of his employment application.

The defendants deny that Flood was harassed, given extra work, or that his work was more closely scrutinized than that of other employees. They maintain that Flood was supervised more closely because he failed to follow department rules. They contend that Flood was counseled and monitored for speaking to the FBI and to the press. According to the defendants, under DIR policy, only a DIR public relations officer can speak to the press about matters relating to DIR, and employees may not speak to the FBI about ongoing investigations without permission. The defendants contend that Flood simply refused to do his assigned job, which did not include the investigation of employee leasing companies. They admit that, at first, Flood was asked to investigate leasing companies. However, they contend that Flood was later told that the investigation had been turned over to other employees and that he should simply do his assigned job. According to the defendants, Flood was given every chance to comply with the rules of the department, but he failed to do so. Thus, although they deny that Flood was disciplined, the defendants argue that, if Flood can show that he was disciplined, there was a legitimate reason for it.

Further, they advance two explanations for the background check. First, they contend that the background check was a routine check conducted on all employees, and that it should have occurred soon after Flood was hired. Second, they contend that the background check was necessary because Pate had begun to consider making Flood an investigator, and the background check needed to be completed before he could become an investigator.[42] There are therefore genuine issues of material fact requiring resolution at

trial. From the evidence Flood has put forth, a jury could reasonably conclude that his "working conditions were so difficult or unpleasant that a reasonable person in [his] shoes would have felt compelled to resign." *Wardwell,* 786 F.2d at 1557.

■ Further, the court finds that, for the purposes of summary judgment, Flood has produced evidence sufficient to raise the inference that this treatment began after, and as a response to, his remarks at the March 10 press conference. The evidence indicates that, although Pate was already angry about Flood's contacts with the FBI and his contacts with the press after February 10,[43] she grew more unhappy with him after his March 10 press conference and decided to take action against him at that time. After Pate heard the tape of Flood's March 10 press conference, she felt "insulted," "offended," "shocked," and "angry."[44] She held a meeting the following day with several other employees and supervisors during which they discussed what Flood had said at the press conference and how DIR should respond. During the meeting, Pate and others reviewed Flood's application for employment, and at that time they decided to do a background check on Flood's employment application.[45] After spending one or two days reviewing Flood's application, another employee suggested to Pate that "Joe may not should have been hired by the department."[46] Pate decided that DIR should conduct background checks on other employees at the same time it investigated Flood,[47] but the idea to conduct the investigations came about because of Flood's March 10 press conference.

Pate, Willett, and two other employees met with Flood on March 21, 1994. During the meeting, Pate told Flood that he had made "some statements in the press that been

---

**42.** Pretrial order at 7, entered on May 9, 1996.

**43.** Memorandum of February 25, 1994, from Pate to Willett, ex. 3 to defendants' motion for summary judgment, filed on June 11, 1996.

**44.** Pate dep. at 211, attached to defendants' memorandum in support of motion for summary judgment, filed May 23, 1996.

**45.** *Id.* at 227–228; Leonard Kiser dep. at 103, ex. 27 to plaintiff's memorandum in opposition to defendants' motions for summary judgment, filed on June 14, 1996.

**46.** Pate dep. at 264, attached to defendants' memorandum in support of motion for summary judgment, filed May 23, 1996.

**47.** *Id.* at 263.

reported that are outright lies." [48] She told him that the "innuendo" created by his statements was "of great concern" to her. [49] Although she felt that "what [Flood] had said publicly ... defame[d] [her], the department and the other individuals affiliated with it," [50] she told Flood that she "want[ed] to respond to [him] in good faith." [51] Thus, Pate herself admits that Flood's remarks at the March 10 press conference had two results: they offended and insulted her, and they prompted her to order an investigation into Flood's background and his employment application. From this, a jury could conclude that Flood's ill treatment was due to his remarks at the March 10 press conference.

Accordingly, summary judgment will be denied as to Flood's first-amendment claim against Cieszynski and Willett in their official capacities to the extent he seeks reinstatement. The *Connick* and *Pickering* tests are questions of fact and law which the court must decide. *Bryson*, 888 F.2d at 1566 n. 2. The other issues are questions of fact. *Id.* The court has found as a matter of law that, based on the evidence before it, Flood spoke about an issue of public concern. The court, however, has found that, for the purposes of summary judgment, there are genuine issues of material fact as to whether Flood's first-amendment interest outweighed DIR's interest, whether Flood was constructively discharged, and whether the conditions which led to his constructive discharge came in substantial part because of Flood's protected speech.

### C. Individual capacity

■■■ Flood has also asserted his first-amendment claim against Willett and Pate in their individual capacities, and thus Flood seeks damages from their personal assets. Willett and Pate contend that they are entitled to qualified immunity in their individual capacities. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The court applies a two-step analysis in determining whether qualified immunity applies to officials sued in their individual capacities. First, the defendant officials must demonstrate that during the alleged conduct, they acted within the scope of discretionary authority. If this is shown, the burden shifts to the plaintiff to demonstrate that the conduct in question violated clearly established law. *Sims,* 972 F.2d at 1236. In this case, the parties agree that the conduct of Willett and Pate was within their discretionary authority. Therefore, the only remaining question is whether the conduct in question violated clearly established law.

■■■ To determine whether a plaintiff has met his burden of demonstrating a violation of a clearly established law, the court must first inquire "whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). [52] Therefore, the court must essentially resolve two questions. First, the court must examine the plaintiff's complaint to determine whether the plaintiff "possesses a right subject to a constitutional violation." *Wooten v. Campbell,* 49 F.3d 696, 699 (11th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 379, 133 L.Ed.2d 302 (1995). If the plaintiff satisfies

---

**48.** Transcript of March 21, 1994, meeting at 2, ex. 10 to defendants' motion for summary judgment, filed on June 11, 1996.

**49.** *Id.*

**50.** *Id.* at 10.

**51.** *Id.* at 3.

**52.** In *Siegert,* the Supreme Court reviewed a D.C. Circuit opinion requiring a lawsuit be *dismissed* because the plaintiff had not met the "heightened pleading" standard required to overcome a quali-

fied immunity defense. The Supreme Court affirmed the dismissal but on different grounds. The Court held that, even before a court examines the sufficiency of the allegations made in the complaint, it must make a threshold inquiry as to "whether the plaintiff has asserted a violation of a constitutional right at all." 500 U.S. at 232, 111 S.Ct. at 1793. Finding that no such right had been established, the Court affirmed the lower court's requirement that the case be dismissed.

this inquiry, the court must then determine whether, under the most favorable version of the facts as alleged, the defendant's actions would have, in fact, violated that clearly established right.

*First question:* As stated, Flood claims that he was constructively discharged for things he said about an issue of public concern in violation of the first amendment. The court must determine whether his constructive discharge violated this constitutional right. "[T]he law is well established that the state may not demote or discharge a public employee in retaliation for speech protected under the first amendment." *Bryson,* 888 F.2d at 1565. Flood therefore has correctly asserted that constructively discharging an employee for protected speech would violate a clearly established right under the first amendment.

*Second question:* Flood must produce evidence that, if proven true, would demonstrate that his first amendment right was violated. However, because Pate and Willett have asserted qualified immunity, Flood "must establish more than broad legal truisms; he ... must demonstrate that the law fixed the contours of the right so clearly that a reasonable official would have understood his acts were unlawful." *Dolihite v. Maughon,* 74 F.3d 1027, 1040–1041 (11th Cir. 1996). Thus, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances.*" *Lassiter v. Alabama A & M University, Bd. of Trustees,* 28 F.3d 1146, 1150 (11th Cir. 1994) (en banc). Moreover, officials need not " 'be creative or imaginative in drawing analogies from previously decided cases.' " *Id.* at 1150 (citations omitted).

As stated, demoting or firing a public employee for engaging in protected speech would constitute a violation of the first amendment. As described above, to determine whether Flood's first-amendment rights were violated, the court must engage in a four-part test. The purpose of the test is to balance "the employee's first amendment interests against the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees," *Bryson,* 888 F.2d at 1566, and determine whether the employee's speech played a "substantial part" in his discharge. *Fikes,* 79 F.3d at 1084.

"The Supreme Court has never established a bright-line standard for determining when the State as an employer may take action adverse to an employee in response to that employee's speech.... Because no bright-line standard puts the reasonable public employer on notice of a constitutional violation, the employer is entitled to immunity except in the extraordinary case" where the *Connick* and *Pickering* tests, described above, "would lead to the inevitable conclusion that the discharge of the employee was unlawful." *Dartland v. Metropolitan Dade County,* 866 F.2d 1321, 1323 (11th Cir.1989); *see also Hansen v. Soldenwagner,* 19 F.3d 573, 576 (11th Cir.1994) ("because ... multi-factor [*Pickering*] balancing process admits of few bright lines, a government agent will know only in the most extraordinary circumstances that what he is doing does violate plaintiff's rights") (internal quotations omitted); *Busby,* 931 F.2d at 774 (defendants entitled to qualified immunity unless "result would be so evidently in favor of protecting the employee's right to speak that reasonable officials in appellee's place would necessarily know that the termination ... under these circumstances" violated the law); *McDaniel v. Woodard,* 886 F.2d 311, 317 (11th Cir.1989) (because "first amendment analysis would not inevitably lead to the conclusion that [plaintiff's] discharge was unlawful, ... [defendant] is entitled to immunity").

The facts presented by Flood in this case do not satisfy these demanding standards—that is, the court cannot conclude that there is sufficient evidence to "truly compel (not just suggest or allow or raise a question about), the conclusion," *Lassiter,* 28 F.3d at 1150, that Pate's and Willett's actions "violate[d] federal law," *id.,* and that it should have been "obvious to all reasonable government actors" in their place that what they did "violate[d] federal law." *Id.* at 1149. Both DIR and Flood have important interests at stake. Whether Flood's interests out-

weigh DIR's is a very close question. This is therefore far from an "extraordinary" case, *Hansen,* 19 F.3d at 576, in which the *Connick* and *Pickering* tests "would ... inevitably lead to the conclusion" that Flood's interests outweighed DIR's. *McDaniel,* 886 F.2d at 317. The court therefore concludes Pate and Willett are immune from Flood's federal claim to the extent he has sued them for damages in their individual capacities.

## V. STATE CLAIMS

Relying on the court's supplemental jurisdiction, 28 U.S.C.A. § 1367, Flood seeks to bring state-law claims against Cieszynski, Pate, and Willett. He sues Cieszynski in her official capacity, Pate in her individual capacity, and Willett in his official and individual capacities. He claims that these defendants committed the state-law tort of invasion of privacy and that they violated SEPA.

### A. Tort claim: invasion of privacy

 As stated, Flood seeks damages from Cieszynski, Pate, and Willett in their official and individual capacities for the state-law tort of invasion of privacy. Where the relief sought affects the state or where the state is, in effect, the party sued, as in a suit against a state official in his official capacity, the eleventh amendment bars any supplemental state claims. *Pennhurst,* 465 U.S. at 117–121, 104 S.Ct. at 917–919. Supplemental jurisdiction does not permit "evasion of the immunity guaranteed by the Eleventh Amendment." *Id.* at 121, 104 S.Ct. at 919. Cieszynski and Willett are therefore immune from the state-law claim to the extent Flood has sued them in their official capacities. In addition, article I, § 14 of the 1901 Alabama Constitution provides "immunity to state offi-

cials sued in both their official and individual capacities." *Tinney v. Shores,* 77 F.3d 378, 383 n. 3 (11th Cir.1996) (per curiam). The only "exception" is for "injunctive relief." *Id.* at 383. Thus, Cieszynski, Pate, and Willett are fully immune from Flood's state-law claim to the extent he has sued them for damages in their official and individual capacities.[53]

 Flood argues that he falls within the immunity exception because he also seeks injunctive relief for the alleged state-law tort violation. Cieszynski and Willett contend that, because Flood is seeking to recover on his state-law claim in *federal court,* they are immune from injunctive relief as well. The court agrees. The Supreme Court has held that the eleventh amendment bars a federal court from "award[ing] injunctive relief against state officials on the basis of state law." *Pennhurst,* 465 U.S. at 91, 104 S.Ct. at 903. "[A] federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when ... the relief sought ... has an impact directly on the State itself." *Id.* at 116, 104 S.Ct. at 917.

### B. SEPA claim

Flood claims that Pate and Willett violated SEPA. The Act is essentially a "whistle-blower" law. It provides, in part, that "A supervisor shall not discharge, demote, transfer, or otherwise discriminate against a state employee regarding the state employee's compensation, terms, conditions, or privileges of employment if the state employee, reports, under oath or in the form of an affidavit, a violation of a law, a regulation, or a rule, promulgated pursuant to the laws of this state, or a political subdivision of this state,

**53.** Flood correctly points out that, in a decision issued after *Tinney,* the Eleventh Circuit Court of Appeals stated that the exceptions to immunity under state law were not limited to injunctive relief. In *McMillian v. Johnson,* 88 F.3d 1554, 1573 (11th Cir.1996), the court wrote that the "Alabama Supreme Court has held on several occasions that the defense of sovereign immunity does not bar suits against state officers for torts committed willfully, maliciously, and outside the scope of their authority." On a petition for rehearing, however, the Eleventh Circuit withdrew this language and reaffirmed *Tinney* as binding precedent, stating that the *Tinney* holding "is clear: under Alabama law, a claim against an Alabama sheriff in his individual capacity is barred by the doctrine of sovereign immunity. We are bound to follow *Tinney,* and do so. We hold that the district court erred in rejecting [the defendant's] sovereign immunity defense to the state law claims." *McMillian v. Johnson,* 101 F.3d 1363, 1365 (11th Cir.1996) (per curiam). Similarly, this court is bound by *Tinney,* regardless as to whether *Tinney* is right or wrong under Alabama law.

to a public body." [54] 1975 Ala.Code § 36–26A–3. Flood seeks damages under SEPA [55] from Pate and Willett in their individual capacities only.[56] The defendants contend that the eleventh amendment bars this claim. Because the court concludes that the facts do not support a claim under SEPA, the court does not reach this issue.

The defendants maintain that Flood has failed to put forth sufficient evidence to state a claim. To prevail on his SEPA claim, Flood must show that (1) a supervisor (2) discriminated against him in the terms, conditions, or privileges of his employment (3) because he made a report (4) of a violation of a state law, regulation, or rule and (5) the report was under oath or in the form of an affidavit. Pate and Willett admit that, during the time in question, they were "supervisors" at DIR, as that term is defined in the Act.[57] Further, the court finds, as discussed more fully above, that the evidence is sufficient to support the conclusion that Pate's and Willett's treatment of Flood was severe enough to amount to constructive discharge. Therefore, the only elements in dispute are the third, fourth, and fifth: whether the defendants' adverse actions toward Flood were (3) because he made a report (4) of a violation of a state law, regulation, or rule and (5) the report was under oath or in the form of an affidavit. Flood claims that he has satisfied these three elements in three different ways. He points to the following: the letter he submitted to Pate on April 19, 1994; the interview he had with employees of the Alabama Attorney General's Office on May 3 and 4, 1994, and the resulting report; and reports he made to the FBI.

 *The Pate letter:* On April 19, 1994, Flood submitted to Pate a letter complaining

---

**54.** The Act, as set forth in Part 26A of Chapter 36 of the 1975 Alabama Code, provides in its entirety as follows:

"§ 36–26A–1 Title.
This chapter shall be known and may be cited as 'The State Employees Protection Act.'
"§ 36–26A–2 Definitions.
As used in this chapter, the following words and phrases have the following meanings:
(1) Public body. All of the following:
 a. A state officer, employee, agency, department, division, bureau, board, commission, council, authority, or other body in the executive branch of state government.
 b. An agency, board, commission, council, member, or employee of the legislative branch of state government.
 c. A law enforcement agency, including the offices of the Attorney General and district attorneys, or any member or employee of a law enforcement agency.
 d. The judicial branch of state government and any member or employee of that branch.
(2) State employee. A person defined as a classified employee under Section 36–26–2.
(3) Supervisor. Any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, regard, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if, in connection with the foregoing, the exercise of the authority is not of a merely routine or clerical nature but requires the use of independent judgment.
"§ 36–26A–3 Prohibited acts.
A supervisor shall not discharge, demote, transfer, or otherwise discriminate against a state employee regarding the state employee's compensation, terms, conditions, or privileges of employment if the state employee, reports, under oath or in the form of an affidavit, a violation of a law, a regulation, or a rule, promulgated pursuant to the laws of this state, or a political subdivision of this state, to a public body.
"§ 36–26A–4 Civil actions.
(a) A state employee shall bring a civil action within two years after the occurrence of the alleged violation of this chapter.
(b) A civil action may be brought in Montgomery County, or in the county in which the supervisor against whom the civil complaint is filed resides.
"§ 36–26A–5 Remedies.
A court, in rendering a judgment in an action brought pursuant to this chapter, may order, where appropriate, payment of back wages, front wages, and compensatory damages, or any combination of these remedies.
"§ 36–26A–6 Action against state not created. This chapter does not create a new cause of action against the State of Alabama or its agencies.
"§ 36–26A–7 Permissible acts.
Nothing in this chapter shall be construed to prevent or prohibit a supervisor from disciplining, discharging, transferring, or otherwise affecting the terms and conditions of a state employee's employment not connected with the conduct protected by this chapter."

**55.** The Act does not provide for injunctive relief. *See supra* note 54 (§ 36–26A–5).

**56.** Plaintiff's memorandum, filed on July 19, 1996, at 6.

**57.** *See supra* note 54.

about DIR's treatment of him.[58] The letter fails to meet at least one of the three remaining SEPA elements. In the letter, Flood complains about DIR's investigation into his background, its "harassment" of him, "the piling on of undue additional work," and "continually criticizing him."[59] He asked that DIR stop the background investigation and "cease" its harassment of him.[60] Flood states that "[a]ll he has done is expose wrongdoing and fraud in workers' compensation payments, and further revealed the lack of aggressive pursuit of the same by the Department of Industrial Relations."[61] Flood states that DIR's investigation into his background "may very well violate his rights under the First Amendment to the U.S. Constitution and the State Whistleblowers Act," presumably a reference to SEPA.[62] Before submitting the letter, Flood had conducted a news conference on March 10 at which he accused DIR of ignoring violations of Alabama law. His background investigation, which is at the heart of his claim that he was subjected to improper treatment, began within a matter of days after the news conference.

The letter therefore does not report "a violation of a law, a regulation, or a rule, promulgated pursuant to the laws of this state, or a political subdivision of this state." Rather, the thrust of the letter is to demand that DIR stop its harassment of Flood.[63] Flood has failed to satisfy the fourth requirement.[64]

■ *Attorney General's Office interview and report:* Flood next claims that, on May 3 and 4, 1994, he reported violations of state and federal law to employees of the Alabama Attorney General's Office. To support this claim, Flood has submitted an interview report, prepared by the employees who interviewed him.[65] The interview and the report do not, however, meet SEPA's requirement that reports of law violations be under oath or in the form of an affidavit. Flood did not sign, or even attest to, the report and thus the report is not in the form of an affidavit. Flood also admits that he cannot remember whether he was sworn, and there is otherwise no evidence that he was sworn before he was interviewed. Flood points out, however, that he "was served with a subpoena calling for his testimony"[66] and that the subpoena required that he "testify truthfully."[67] Flood argues that these circumstances are tantamount to his having been sworn. The court cannot agree. " 'Oath or affirmation' is a formal assertion of, or attestation to, the truth of what has been, or is to be, said. It is designed to ensure that the truth will be told by insuring that the witness or affiant will be impressed with the solemnity and importance of his words. The theory is that those who have been impressed with the moral, religious or legal significance of formally undertaking to tell the truth are more likely to do so than those who have not made such an undertaking or been so impressed." *United State v. Turner,* 558 F.2d 46, 50 (2nd Cir.1977). *See also* Black's Law Dictionary at 966 (1979 ed.) (An oath is an "outward pledge" or an "external pledge or asseveration, made in verification of statements made,

58. April 19, 1994, letter from McPhillips and Waites to Pate, ex. 23 to plaintiff's memorandum in opposition to defendants' motions for summary judgment, filed on May 23, 1996.

59. *Id.*

60. *Id.*

61. *Id.*

62. *Id.*

63. Admittedly, in the letter, Flood alleges that DIR is violating SEPA (that is, the State "Whistleblowers Act") which, as a State statute, would fit SEPA's requirements. However, Flood does not claim that his ill treatment came as a result of his report that DIR was violating SEPA.

Flood's claim is that DIR knew of violations of Alabama law regulating employee leasing companies and failed to act, not that DIR harassed him because he reported to Pate that DIR was violating SEPA.

64. Because Flood verified the letter it arguably satisfies the Act's "in the form of an affidavit" requirement. In any event, the court need not reach this issue.

65. Ex. 35 to brief in support of plaintiff's motion to reconsider, filed July 19, 1996.

66. *Id.*

67. Ex. 36 to brief in support of plaintiff's motion to reconsider, filed July 19, 1996.

or to be made." It is intended as a "signification" and "evidence of the serious" of the pledge or promise.). There is simply no evidence that, when Flood visited the Alabama Attorney General's Office, he provided such an outward or external pledge or a signification of his promise to tell the truth.

Admittedly, Flood was subpoenaed to the Attorney General's Office. His appearance based on a subpoena, however, was not by itself sufficient to warrant the conclusion that his interview was under oath. The subpoena was based on three Alabama statutes: §§ 36–15–13, 12–16–198, and 12–17–184(18) of the 1975 Alabama Code. None of these statutory provisions indicates that a person's *mere appearance*, albeit upon subpoena, before employees of the Attorney General constitutes an actual *oath* of truth.[68]

The court can appreciate Flood's desire to have SEPA's oath requirement read broadly to cover his circumstances, and indeed a reasonable argument can be made that SEPA should be read liberally. However, a broad reading of the SEPA oath requirement has an up-side *and* a down-side. The up-side would be that more statements would fall within the protection of the whistleblower statute. The down-side of a broad reading carries the day, however. Obviously, the Alabama Legislature included the oath requirement in SEPA "to ensure that the truth will be told." *Turner*, 558 F.2d at 50. The Legislature recognized that whistleblowers can do a lot of public good by exposing government waste and corruption. The Leg-

islature also recognized, however, that whistleblowers can do a lot of harm, often to good and innocent people, that their statements can be unfounded, irresponsible, and sometimes even vindictive and malicious. Therefore, to help ensure that whistleblowers tell the truth the Legislature imposed an oath requirement so as to impress on whistleblowers not only the solemnity of their conduct but also that their statements would subject them to the State's criminal perjury statutes if false. Alabama has several statutes that expressly provide for criminal penalties for perjury, that is, false statements made under "oath." *See, e.g.,* 1975 Ala.Code §§ 13A–10–100 through 13A–10–109.[69] If SEPA's oath requirement is read broadly and the reading is the same in both SEPA and the State's perjury statutes, then statements could be brought within the perjury statutes' coverage that should not be there. Indeed, if Flood should be prosecuted for perjury, his first and strongest defense (and an assuredly successful one) would be that he was never given a formal oath by the Attorney General's employees or otherwise put on notice that he would be subject to severe criminal sanctions for what he said. On the other hand, if SEPA's oath requirement is read broadly but the reading in SEPA is more expansive than that in the State's perjury statutes, then an important legislative purpose would have been thwarted, for not all statements made under the whistleblower statute would be subject to perjury penalties. Whistleblowers who made unfounded, irre-

---

**68.** Section 36–15–13 provides:

"The attorney general, either in person or by assistant, may appear before any grand jury in this state and present any matter or charge to them for investigation, and prepare and present to the grand jury indictments for any violation of the laws of this state and issue subpoenas for witnesses to appear in the same manner and to the same extent as district attorneys may now or hereafter do."

Section 12–16–198 provides:

"District attorneys shall have authority, and it shall be their duty, to issue a subpoena for any person whom they may desire to appear before the grand jury to give evidence of any violation of the law."

And § 12–17–184(18) provides:

"To, at any time the grand jury is not in session, issue subpoenas to persons to come before them, and they shall have power to

administer oaths to those persons and examine them as to any violation of the criminal laws of the state."

**69.** For example, § 13A–10–101(a) provides that "A person commits the crime of perjury in the first degree when in any official proceeding he swears falsely and his false statement is material to the proceeding in which it is made." Subsection (b)(1), in turn, defines "swears falsely" to include the "making of a false statement under *oath* required or authorized by law, or the swearing or affirming the truth of such statement previously made, which the declarant does not believe to be true. (Emphasis added.) And subsection (b)(3) defines "oath" to include "an affirmation and every other mode authorized by law of attesting to the truth of that which is stated."

sponsible, and even vindictive and malicious statements would not be subject to the criminal perjury penalties for their conduct but could still receive SEPA's protection.

■ *Reports to the FBI.* Finally, Flood claims that he reported violations of state and federal law to the FBI.[70] He claims that the FBI agents to whom he made these reports told him that he was required to tell the truth and that he could face criminal charges if he did not.[71] Again, however, there is no evidence that Flood formally or outwardly pledged or attested to tell the truth or otherwise formally signified that he understood that he was under oath and subject to criminal perjury statutes. For the reasons already given, the circumstances presented by Flood did not equate to an oath.

Accordingly, it is ORDERED that the motions for summary judgment filed by defendants Alabama Department of Industrial Relations, Dottie Cieszynski, Lenora Pate, and Frank Willett on April 19, 1996, May 2, 1996, May 23, 1996, and May 24, 1996, are granted and denied as follows:

(1) Summary judgment is denied as to plaintiff Joseph Flood's first-amendment claim for injunctive relief against defendants Cieszynski and Willett in their official capacities;

(2) Summary judgment is granted as to all remaining claims, both federal and state, against defendants Alabama Department of Industrial Relations, Cieszynski, Pate, and Willett;

(3) Defendant Alabama Department of Industrial Relations is dismissed as a defendant; and

(4) Defendant Pate is dismissed as a defendant.

---

**70.** Flood aff., ex. 37 to brief in support of plaintiff's motion to reconsider, filed July 19, 1996.

**71.** *Id.* at 2.